*367 OPINION OF THE COURT
Simons, J.
This is an article 78 proceeding in which petitioner Niagara Mohawk Power Corporation challenges an order of respondent Public Service Commission. The order directed Niagara Mohawk to refund to its ratepayers moneys collected during 1977-1981 for charges imposed pursuant to the fuel adjust *368 ment clause in the Niagara Mohawk rate tariff. The Commission’s action followed its determination that a portion of the company’s expenses for fuel during those years had been imprudently incurred. The Appellate Division annulled the order, finding the refund illegal because there was no statutory authority for the Commission’s action. The court ruled that the power to direct a refund must be granted by the Legislature and that, before the 1981 amendment to Public Service Law § 66 (12), the Commission had neither express nor implied authority to order a utility to refund imprudent fuel expenditures previously passed through to ratepayers by means of fuel adjustment clauses. We granted the Commission leave to appeal and now reverse. The power to order refunds of imprudent charges collected under fuel adjustment clauses may be implied from the Commission’s general rate-making powers and from its authority over fuel adjustment allowances under former section 66 (12) of the Public Service Law (L 1974, ch 863, §§ 1, 2).*
I
In 1984, after Public Service Commission hearings, an administrative determination was made that certain fuel expenses, charged to Niagara Mohawk’s ratepayers through fuel adjustment clauses, resulted from imprudent decisions by Niagara Mohawk relating to prolonged power outages at its Dunkirk Unit No. 3 in 1980 and 1981. A decision was issued recommending that $1,013 million in excessive fuel charges be refunded to the ratepayers. After review, the Public Service Commission modified this determination, concluding that the utility had been imprudent in its practices concerning its coal-fired generating units not only at the Dunkirk facility in 1980 and 1981 but also at Oswego, Huntley and Dunkirk during the years 1977 through 1981. The Commission therefore ordered Niagara Mohawk to refund to ratepayers $31.9 million in incurred fuel expenses which the utility had collected through its fuel adjustment clauses. Niagara Mohawk challenged the order in this article 78 proceeding.
II
The Public Service Commission possesses only those powers *369 expressly delegated to it by the Legislature, or incidental to its expressed powers, together with those required by necessary implication to enable the Commission to fulfill its statutory mandate (see, Matter of Consolidated Edison Co. v Public Serv. Commn., 47 NY2d 94, 102, revd on other grounds 447 US 530, revd on remand on other grounds 51 NY2d 816; Matter of Rochester Tel. Corp. v Public Serv. Commn., 87 AD2d 672, 673, affd 58 NY2d 874; see also, Public Service Law § 4 [1]). Among the powers delegated to the Commission is the authority to establish the rates charged by a utility for gas and electric service (see, Public Service Law § 66 [12]; see generally, Comment, Utility Rates, Consumers, and the New York State Public Service Commission, 39 Alb L Rev 707 [1975]). Indeed, it has been recognized that when it comes to setting rates for such service the Commission has been granted "the very broadest of powers” (see, Matter of Campo Corp. v Feinberg, 279 App Div 302, 305, affd 303 NY 995), the Legislature mandating only that the rates fixed be "just and reasonable” (see, Matter of Abrams v Public Serv. Commn., 67 NY2d 205, 211-212 [construing Public Service Law § 72]).
In the exercise of its rate-making power, the Public Service Commission may not deny a utility a reasonable rate of return on its investment (see, Matter of New Rochelle Water Co. v Public Serv. Commn., 31 NY2d 397, 407). The opportunity to earn a fair return does not mean, however, that a utility will be permitted to include negligent or wasteful expenditures in its operating expenses (see, West Ohio Gas Co. v Public Util. Commn., 294 US 63, 68-70). The protection of a utility’s treasury and the preservation of its financial integrity is a proper object of Public Service Commission regulation, but the specific function of the rate-making power is to protect the utility’s ratepayers (see, Matter of General Tel. Co. v Lundy, 17 NY2d 373, 380). Thus, "[t]here can be no doubt that a regulatory body, such as the Public Service Commission, may review the operating expenses of a utility and thereby prevent unreasonable costs for materials and services from being passed on to rate payers” (id., at 378 [citing Chicago & Grand Trunk Ry. Co. v Wellman, 143 US 339]; compare, Matter of Abrams v Public Serv. Commn., 67 NY2d 205, supra [use of "prudent investment” test in regulatory treatment of abandoned plants approved]).
Normally, rates set by the Commission are prospective, and reflect a determination as to what the utility’s allowed reve *370 nue requirement should be, based upon an estimation for the upcoming rate year of the utility’s rate base (working capital and net valuation of tangible property), historical operating expenses, and rate of return on capital assets (see generally, Comment, op. cit., 39 Alb L Rev, at 719-724). Once the Commission has projected the utility’s revenue requirements for the rate year, it determines the maximum rates the utility can charge to meet its requirements. Thus, the rate-making process is a forum for determining, among other things, whether the utility’s operating expenses were prudently and reasonably incurred in the past such that they may properly be used as a basis for projection of operating expenses in the upcoming rate year.
One of the difficulties with prospective ratesetting, however, is the problem of reconciling fixed rates to the pressures and demands of a fluctuating economy. The failure to make such a reconciliation may result in unreasonably high rates in periods of economic recession and hardship to the utility during inflationary cycles (see generally, Trigg, Escalator Clauses in Public Utility Rate Schedules, 106 U Pa L Rev 964 [1958]). A widely used regulatory solution to this problem is the use of automatic rate adjustments, such as the fuel adjustments at issue here, whereby the rate charged for service varies automatically with changes in operating costs (see, id.; and see, Warren, Regulated Industries’ Automatic Cost of Service Adjustment Clauses: Do They Increase or Decrease Cost to the Consumer?, 55 Notre Dame Law 333 [1980]). New York utilities have used such automatic rate adjustment provisions since 1917 (see, Matter of Consumer Protection Bd. v Public Serv. Commn., 85 AD2d 321, 322, appeal dismissed 57 NY2d 673).
The fuel adjustment clauses presently before us provide a method for the rapid adjustment of rates, thus enabling utilities to contend with unpredictable increases in volatile fuel prices and to avoid both the 11-month delay and the forecasting procedures inherent in New York’s prospective rate-making process. By including such a clause in their rate tariff, utilities may automatically, and very rapidly, adjust rates to recover actual fuel expenses as they are incurred. In this way, serious cash flow and earnings shortfalls, which can result from the cost of producing fuel-generated energy, are avoided and the financial integrity of utilities is protected (see, Matter of Consumer Protection Bd. v Public Serv. Commn., 85 *371 AD2d 321, 323, supra; see also, Note, Due Process and the Automatic Fuel Adjustment Clause, 52 Ind LJ 637, 645 [1977]).
The mechanics of each utility’s fuel adjustment clause are set forth in company tariffs and are thus subject to approval by the Commission. Niagara Mohawk’s tariffs provided that when its monthly fuel costs were higher than the "base level” of fuel costs reflected in its current rates, the company was authorized to make a filing with the Commission to recover these increased costs from its customers through fuel adjustment charges shown on their bills. Niagara Mohawk was permitted to automatically increase its rates, as requested, through such charges imposed on its customers three days after the filing. This method permitted Niagara Mohawk, like other electric utilities in New York, to increase its charges to customers by millions of dollars on short notice without the Commission’s prior approval. The only review of their reasonableness was performed by the Commission retrospectively (see generally, Public Service Law § 66 [12]; § 72-a).
The use of automatic fuel adjustment clauses by the Public Service Commission over the years, and its authority to do so, has been recognized by the courts (see, Matter of Consumer Protection Bd. v Public Serv. Commn., 85 AD2d 321, 323-324, supra) and by the Legislature. The Legislature recognized such authority in 1974, when it added section 72-a to the Public Service Law requiring monthly reporting of fuel costs, and amended section 66 (12) to direct the Commission to review all filings for increases in the rate charged for fuel costs; again in 1977, when it added section 66 (12-a) to the Public Service Law; and in 1981 when it amended section 66 (12) once more to formalize the power of the Commission to order refunds of improper fuel adjustment charges. Although some of these statutes do not expressly refer to fuel adjustment clauses, Niagara Mohawk concedes that the legislative action was addressed to rate increases implemented by fuel adjustment clauses, and both recognized their lawfulness and authorized the Commission to review them. The utility now asserts, however, that even if this authorized retrospective review of the charges establishes that they were improper, the Commission may not order corrective action in the form of refunds to customers for rate increases in 1977-1981 because, prior to 1981, there was no statutory authority for it to do so.
ra
In the past when determining whether the Public Service *372 Commission has acted outside the scope of its legitimate power, we have engaged in "a realistic appraisal of the particular situation to determine whether the administrative action reasonably promotes or transgresses the pronounced legislative judgment” (Matter of Consolidated Edison Co. v Public Serv. Commn., 47 NY2d 94, 102, supra; see generally, Fitzpatrick, Toward a Broad Reading of Implied Powers of State Public Utility Commissions: Combatting a Legacy of Laissez Faire, 90 Dick L Rev 415 [1985]). When the Commission acts pursuant to its statutory authority to set utility rates, the "pronounced legislative judgment” is that the rate set should be "just and reasonable” (Public Service Law § 72). If the rate-setting process results in a rate tariff reflecting "a just and reasonable balancing of consumer and investor interests”, the legislative intent, as well as constitutional and decisional mandates, is satisfied (see, Matter of Abrams v Public Serv. Commn., 67 NY2d 205, 215, supra).
The use of adjustment allowances by regulatory commissions has been criticized because it is said they result in "an abdication of the state’s regulatory function” and provide "a disincentive to the economical operation and purchase of fuel supplies by the utility since it may fully recover any cost it incurs”, thus encouraging the promulgation of rates which are neither just nor reasonable to the ratepayer (Note, op. cit, 52 Ind LJ, at 639 [nn omitted]; see generally, Kendrick, Efficiency Incentives and Cost Factors in Public Utility Automatic Revenue Adjustment Clauses, 6 Bell J Econ 299 [1975]). The usefulness of the mechanism is maintained, and these criticisms met, however, when the regulatory body reviews charges recouped by a utility through a fuel adjustment clause and determines that such charges were "just and reasonable” because prudently incurred. A necessary corollary to such review is the power to take corrective action and order refunds of those charges which were not prudently incurred. Given the Public Service Commission’s conceded power to approve fuel adjustment clauses and to review charges imposed pursuant to them — as evidenced by their historical use and the recognition of them by the courts, the Legislature and the regulated utilities themselves — and given the broad power of the Commission to establish just and reasonable rates generally, the power to order refunds must be implied, for there is little purpose in reviewing fuel adjustment charges, and the consumer’s interests are ignored, if corrective action is not authorized for imprudent expenditures automatically *373 passed through to the ratepayers. Manifestly, a refund is justified when the charges passed through to ratepayers result not from marketplace conditions, which the adjustment allowances are intended to ameliorate, but from the utility’s own inefficiency and mismanagement. In such circumstances, none of the perceived salutary consequences of a fuel adjustment clause are furthered (see, Note, op. cit., at 639).
Thus, a "realistic appraisal of the situation” requires a determination that a Public Service Commission order, directing the utility to refund to ratepayers charges based on imprudently incurred fuel expenses collected pursuant to a fuel adjustment clause in the rate tariff, reasonably promotes the legislative intention that the Commission establish just and reasonable rates (see, Matter of Consolidated Edison Co. v Public Serv. Commn., 47 NY2d 94, 102, supra; and see, Fitzpatrick, op. cit., at 436-438).
IV
Niagara Mohawk relies principally on prior decisions which, it claims, demonstrate that the courts consistently have rejected the Commission’s past efforts to claim an asserted power, necessarily implied from its general rate-making power, to order refunds paid to ratepayers (see, Matter of Rochester Tel. Corp. v Public Serv. Commn., 87 AD2d 672, supra; Matter of Long Is. Light. Co. v Public Serv. Commn., 80 AD2d 977, Iv denied 54 NY2d 601; Matter of Niagara Mohawk Power Corp. v Public Serv. Commn., 54 AD2d 255). None of these cases presented the issue now before us, namely, whether the Commission has the power to order the refund or moneys collected under an automatic adjustment clause, and each is distinguishable on its facts. The Rochester Telephone case held that the Commission could not order the utility to flow through to ratepayers the tax deduction associated with a Federal tax refund which itself was passed through to ratepayers pursuant to Public Service Law § 113 (2) (see, Matter of Rochester Tel. Corp. v Public Serv. Commn., 87 AD2d 672, 673, supra). In Long Is. Light., the court held that the Public Service Commission had no power to order a refund to 279 customers who had been charged in excess of the approved rate where the proper rate classification of the particular customer was dependent upon the Commission’s broad interpretation of Public Service Law § 76, an interpretation promulgated after the excessive rates had been charged and *374 collected (see, Matter of Long Is. Light. Co. v Public Serv. Commn., 80 AD2d 977, 978, supra). In the earlier Niagara Mohawk decision, the Appellate Division determined that the Commission was without authority to order a utility to flow through to its ratepayers Federal income tax refunds received after the tax years to which the refunds related (see, Matter of Niagara Mohawk Power Corp. v Public Serv. Commn., 54 AD2d 255, 256-257, supra).
Niagara Mohawk also contends that the Legislature has granted the Public Service Commission express refund powers from time to time to meet perceived needs (citing Public Service Law § 66 [20]; § 113 [1], [2]; § 118 [3]), and that, in 1981 after ascertaining the need to expressly provide for a Commission power to order refunds of fuel adjustment clause charges, the Legislature amended Public Service Law § 66 (12) to add such a provision (see, L 1981, ch 304). It argues that in the face of consistent treatment by courts and the Legislature concerning the need for express refund authority, the Commission is wrong in claiming that a power to refund excessive charges for fuel has always existed. The utility maintains that the 1981 amendment to section 66 (12) did not merely codify an existing implied power but, rather, established a new refund power.
The legislative history is at best inconclusive: it certainly does not support Niagara Mohawk’s contention. The bill which eventually amended Public Service Law § 66 (12) was part of the Attorney-General’s legislative program for 1981 and was apparently prompted by concern engendered by the Appellate Division’s decision in Matter of Niagara Mohawk Power Corp. v Public Serv. Commn. (54 AD2d 255, supra [Commission has no implied power to order a refund to ratepayers of Federal income tax refund]). Correspondence in the bill jacket from the Attorney-General and the sponsors of the legislation suggest that it was introduced either to clarify a power previously exercised by the Public Service Commission to refund imprudent adjustment charges or to authorize it to do so (see, Bill Jacket, L 1981, ch 304, mem of June 23, 1981, Robert Abrams, Attorney-General; mem re S.6233, Senator Dale M. Volker; cf, mem re A.5902-B, Assemblyman Joseph Ferris). A lobbyist for New York power companies— the Energy Association of New York State — along with certain utilities, indicated that the bill was unnecessary because the Public Service Commission already had such a refund *375 power which it "freely uses” (see, id.). The New York State Energy Office agreed with this interpretation observing that the amendment merely codified the Commission’s authority "in more specific language” (id., mem of June 18, 1981, Stanley B. Klimberg, General Counsel, New York State Energy Office).
Moreover, none of the statutes Niagara Mohawk cites are indicative of a legislative intent to allow refunds only when expressly authorized by statute. Each is concerned with rate formula or rate design items prospectively reviewed and approved by the Commission in a rate proceeding and, hence, presumed to have been prudently incurred (see, Public Service Law § 66 [20] [refund of revenues, in aggregate, in excess of authorized rate of return]; § 113 [1] [refund of unjustified temporary rates]; § 113 [2] [refund of moneys refunded to utility from any source]; § 118 [3] [refund of overpayment by individual consumer]). Nothing in these provisions suggests that the Legislature meant to prohibit the Commission from ordering the refund of automatically recovered fuel expenses when such expenses had not been subjected to a Commission review for reasonableness in a regular rate proceeding.
Finally, Niagara Mohawk’s contention that excessive fuel expenses collected from ratepayers through fuel adjustment clauses could be refunded only if the Public Service Commission had invoked the temporary rate procedure of Public Service Law § 114 prior to approving the fuel adjustment clause formula is also without merit. The courts have previously recognized that this provision "was plainly designed to permit the Commission to prescribe temporary rates during the period that permanent rates are under consideration by the Commission or the courts and until a permanent rate by the Commission is finally established and actually placed in effect” (County Transp. Co. v Maltbie, 273 App Div 437, 440). The section has no applicability to a fuel adjustment clause contained in a rate tariff setting permanent rates.
Accordingly, the order of the Appellate Division should be reversed, with costs, and the determination and order of the Public Service Commission reinstated.
Chief Judge Wachtler and Judges Kaye, Titone and Bellacosa concur; Judges Alexander and Hancock, Jr., taking no part.
Order reversed, etc.

In 1981 the Legislature amended Public Service Law § 66 (12) to grant the Commission express authority to order refunds to ratepayers of fuel adjustment charges imprudently imposed (see, L 1981, ch 304).