[659 NYS2d 563]

In the Matter of MCI TELECOMMUNICATIONS CORPORATION et al., Petitioners, v PUBLIC SERVICE COMMISSION OF THE STATE OF NEW YORK et al., Respondents.

Third Department, July 3, 1997

## APPEARANCES OF COUNSEL

*Whiteman, Osterman & Hanna,* Albany *(Michael Whiteman, Jonathan P. Nye* and *D. Scott Bassinson* of counsel), and *Richard C. Fipphen,* Rye Brook, for MCI Telecommunications Corporation, petitioner.

*Ward, Sommer & Moore, L. L. C.,* Albany *(Douglas H. Ward* of counsel), and *Bruce J. Weston,* Columbus, Ohio, for American Association of Retired Persons, petitioner.

*Maureen O. Helmer,* Albany *(Lawrence G. Malone, Jonathan D. Feinberg, Diane T. Dean, Cheryl L. Callahan* and *Maureen J.M. Ely* of counsel), for Public Service Commission of the State of New York, respondent.

*Sandra DiIorio Thorn,* New York City, and *Davis, Polk & Wardwell,* New York City *(Guy Miller Struve* of counsel), for New York Telephone Company, respondent.

## OPINION OF THE COURT

CARPINELLO, J.

In July 1992, respondent Public Service Commission (hereinafter the PSC) commenced a proceeding to consider a "Performance-Based Incentive Regulatory Plan" for respondent New York Telephone Company (hereinafter NY Tel). Its objective was to devise an innovative regulatory structure that would give NY Tel the incentive to undertake actions which would increase its efficiency and consequently provide greater consumer benefits. The proceeding was divided into two phases designated as "Track 1" and "Track 2". The objectives of Track 1 were to determine NY Tel's 1994 revenue requirements and establish its baseline rates. In essence, the 1994 rates would "serve as a bridge between [NY Tel's] 1994 rate plan and the more comprehensive, longer-term [incentive] plan" developed in Track 2.

A Track 1 final order, issued January 28, 1994, directed NY Tel to reduce its rates by $170 million and created a "set-aside" of $153.3 million from its 1994 revenues. These set-aside funds were designed to benefit consumers by funding short-term service improvements and by providing incentives for network and service quality improvement, customer price and service plans, strategies for competition, maintenance of universal service and the marketing of new services. In the order, the PSC readily acknowledged that its resolution of various revenue requirement issues suggested that NY Tel's revenues could be significantly reduced, but it found that ordering a large rate reduction at that time would impair NY Tel's efforts to improve the quality of its service and network. Thus, in order to strike a balance between short and long-term benefits, the Track 1 order provided for substantial immediate rate reductions while also setting aside a portion of the revenues to facilitate improved performance by the company in several key areas.

Neither petitioner MCI Telecommunications Corporation, which is both a customer and competitor of NY Tel, nor petitioner American Association of Retired Persons, a not-for-profit organization with approximately 2.5 million members State-wide, petitioned for a rehearing of the Track 1 determination within 30 days thereafter (*see,* Public Service Law § 22). On March 14, 1994 MCI did, however, join in a March 11, 1994 petition for rehearing filed by Sprint Communications Company. Ultimately, however, both Sprint and MCI withdrew these petitions.

As part of the Track 2 phase, a multiyear "Performance Regulation Plan" (hereinafter the Plan) was agreed to in September 1994 by, among other entities and government officials, NY Tel, the American Telephone Consumers Council, the State Departments of Economic Development and Education, various municipalities, the Public Utility Law Project of N. Y., Inc. and the State Telephone Association. The Plan, which spans the years 1995 through 1999 (and can be extended to the year 2001 at NY Tel's option provided it meets various requirements), was intended to "protect consumers during the transition to a more competitive telecommunications industry, provide appropriate regulatory flexibility to [NY Tel] in the increasingly competitive telecommunication environment and enhance competition".

The Plan required, *inter alia,* cumulative rate reductions for a variety of services, rate eliminations for other services and mandated service quality measures, with monetary rebates to customers and penalties for NY Tel if such measures are not achieved. It also committed NY Tel to a number of "Infra-Structure Development" improvements, including a "Diffusion Program".[1] Under the "Revenue Reductions and Service Pricing" provision of the Plan, NY Tel agreed to "limit rate filings during the tenure of the Plan to those required or allowable under the provisions of the Plan and * * * not [to] file for general rate relief before the end of the term", while the PSC agreed "not [to] institute a general rate proceeding for [NY Tel]".

---

1. The Diffusion Program is designed "to bring advanced telecommunications to areas of the [S]tate that will not receive these services in the near future if deployment is driven exclusively by the market". It requires NY Tel to expend $50 million ($10 million was to be expended in each of the first five years) and provides that if the funds allocated for the program have not been expended within five years, the remaining funds shall be used for the benefit of ratepayers as determined by the PSC.

A panel of Administrative Law Judges recommended that the Plan be adopted with some limited modifications and touted it, as modified, to be "a sound regulatory regime for NY Tel". Exceptions to this decision were filed by, among others, NY Tel and petitioners. Following public sessions attended by PSC commissioners and other interested parties, including petitioners, the PSC issued an order on June 16, 1995 announcing its position that "the fundamental structure of the Plan is sound" and outlined various modifications to it. Following NY Tel's agreement to the Plan as modified and interpreted by the PSC and comments filed by, among others, MCI, the PSC adopted the Plan as modified at an August 1, 1995 public session and issued a written opinion and order shortly thereafter.

The PSC modified the Plan by, *inter alia*, imposing stricter service quality requirements on NY Tel and increased financial penalties for its failure to meet these requirements; lowering the access charges paid by interexchange carriers; accelerating the schedule for intraLATA presubscriptions and establishing a third-year competitive checkpoint. With respect to the $153.3 million set-aside funds, the PSC found that "the changes and interpretations we are requiring have the effect of shifting to [NY Tel] a considerable amount of the risk related to the Plan, and that the Modified Plan provides ample consideration for allowing the company to retain the Track I set-aside". Petitioners commenced the instant CPLR article 78 proceeding, which has been transferred to this Court, seeking to annul the Track 1 and Track 2 determinations.

We begin our analysis by finding that petitioners' challenges to the Track 1 determination are untimely.[2] The Track 1 decision, issued January 28, 1994, was a "final and binding" (CPLR 217 [1]) administrative determination which triggered the four-month Statute of Limitations. We reject petitioners' claim that the statutory limitations period should be measured from MCI's September 13, 1995 withdrawal of its petition for rehearing.

We note that MCI's March 14, 1994 letter seeking to join in Sprint's petition for a rehearing and the petition itself were both untimely inasmuch as an application "for a rehearing in respect to any matter determined * * * must be made within thirty days after the service of such order, unless the [PSC] for

---

2. Petitioners' primary objections to the Track 1 determination are that the record does not quantify the benefits to ratepayers from network and service incentives and that the Plan will cost ratepayers approximately $1.2 billion over its term and was unlawfully adopted without notice to the parties.

good cause shown shall otherwise direct" (Public Service Law § 22; *see, Matter of Gross v State of N. Y. Pub. Serv. Commn.*, 195 AD2d 866, 867, *lv denied* 82 NY2d 660). Accordingly, the decision to grant and hold a rehearing was at the complete discretion of the PSC and as such did not toll the four-month Statute of Limitations within which to bring a CPLR article 78 proceeding (*see, id.*, at 867-868; *see generally, Matter of Hunt Bros. Contrs. v Glennon*, 214 AD2d 817, 819; *Matter of Miller v Ambach*, 124 AD2d 882; *Matter of Filut v New York State Educ. Dept.*, 91 AD2d 722, 723, *lv denied* 58 NY2d 609; *Matter of Seidner v Town of Colonie, Bd. of Zoning Appeals*, 79 AD2d 751, 752, *affd* 55 NY2d 613; *cf., Matter of Hicks v Fogg*, 79 AD2d 258). In short, we conclude that petitioners may not in this proceeding, instituted nearly two years after issuance of the Track 1 determination, mount an attack on it. Quite simply, "the time for such a challenge is now long past" (*Matter of Public Serv. Commn. v Rochester Tel. Corp.*, 81 AD2d 200, 202, *affd* 55 NY2d 320).

■■ With respect to the Track 2 determination, petitioners first argue that the PSC's final approval of the Plan resulted from violations of the Open Meetings Law (Public Officers Law art 7) and the PSC's settlement rules (*see*, 16 NYCRR 3.9). We reject both claims.

■ The cornerstone of the Open Meetings Law is that decisions made by public bodies should be made publicly (*see, e.g., Matter of Gernatt Asphalt Prods. v Town of Sardinia*, 87 NY2d 668, 686). The Open Meetings Law is violated when a quorum of a public body holds a private meeting for the purpose of transacting public business, thus making unavailable for public scrutiny that body's deliberative process (*see, e.g., Matter of Orange County Publs. v Council of City of Newburgh*, 60 AD2d 409, 412-414, *affd* 45 NY2d 947). Upon our review of the pleadings, we find that petitioners' allegations that private meetings took place among a quorum of the PSC commissioners in violation of the Open Meetings Law are merely conclusory.

Petitioners allege that because the PSC did not debate or vote on the Plan at either the May 10, 1995 or June 1, 1995 public sessions, the PSC's debate and determination must have been made in private before the June 1, 1995 public session. While it is clear that staff members and PSC commissioners discussed this exceedingly complex matter outside the confines of the public meetings, petitioners do not allege or present any evidence that a quorum attended any such meeting (*see*, Public Officers Law § 102 [1]; *see also, Mobil Oil Corp. v City of Syra-*

*cuse Indus. Dev. Agency*, 224 AD2d 15, 29, *appeal dismissed* 89 NY2d 860, *lv denied* 89 NY2d 811; *Matter of Tri-Village Publs. v St. Johnsville Bd. of Educ.*, 110 AD2d 932, 933-934; *Matter of Orange County Publs. v Council of City of Newburgh, supra*), or that these discussions were part of an effort to thwart public scrutiny of their process in deliberate violation of the Open Meetings Law.

This being the case, we reject petitioners' argument that the PSC violated the Open Meetings Law. On the contrary, in light of (1) the public meetings that took place at which commissioners' positions were summarized and explained (*see generally, Matter of City of New Rochelle v Public Serv. Commn.*, 150 AD2d 441, *lv denied* 74 NY2d 610) and interested parties' comments and opinions were addressed, (2) the oral argument permitted by the PSC at which interested parties, including MCI, were given an opportunity to participate, and (3) the opportunity given to interested parties, including petitioners, to comment on the Plan before it was adopted in final form, it is clear that public input was sought at all relevant stages and the design of the Open Meetings Law—"to assure the public's right to be informed" (*Matter of Orange County Publs. v Council of City of Newburgh, supra*, at 418)—was honored in this process. In any event, even if we were to find a violation of the Open Meetings Law, we would conclude—given the extensive public input into each stage of the proceeding and the complete dearth of evidence that the PSC intentionally violated the Open Meetings Law—that petitioners failed in their burden of demonstrating good cause warranting the exercise of our discretionary power to nullify the Track 2 determination (*see,* Public Officers Law § 107 [1]; *see also, Matter of New York Univ. v Whalen*, 46 NY2d 734, 735).

■ Nor are we persuaded by petitioners' contention that final approval of the Plan resulted from a violation of 16 NYCRR 3.9, which provides that a notice of impending negotiations between *parties* must be filed as soon as it appears that settlement of an issue is possible. First, 16 NYCRR 3.9 clearly speaks in terms of negotiations settlements between parties; the PSC is clearly not a "party" as that term is defined under the regulations (*see,* Public Service Law § 2 [1]; 16 NYCRR 1.1, 1.2 [d]). Moreover, it is not insignificant that, as between the PSC and NY Tel, the Legislature has provided a mechanism by

which ex parte communications are permitted (*see*, State Administrative Procedure Act § 307 [2]).[3]

■ Petitioners attack many aspects of the Track 2 determination on the ground that they are not supported by the record. Applying the appropriate standard of review for the determination, we conclude that petitioners have not demonstrated that the PSC's judgment was exercised without any rational basis or without adequate support in the record (*see, Matter of New York State Council of Retail Merchants v Public Serv. Commn.*, 45 NY2d 661, 672). In this vein, we note that "[i]n exercising its independent judgment as to rate making, the PSC is not limited to data presented at the hearings and conclusions recommended by the parties at the hearings" (*Matter of Owners Comm. on Elec. Rates v Public Serv. Commn.*, 194 AD2d 77, 80; *see, Matter of Rochester Gas & Elec. Corp. v Public Serv. Commn.*, 135 AD2d 4, 10, *appeal dismissed* 72 NY2d 840), and that "[t]he scope of judicial review in these matters is very limited" (*Matter of County of Orange v Public Serv. Commn.*, 37 NY2d 762, 765).

Petitioners claim that there is no support in the record for the PSC's determination approving the level of NY Tel's access charges. While petitioners argue that no studies have been included in the record comparing the revenues and expenses of access service, the PSC is not limited to evidence presented by the parties in structuring rates (*see, e.g., Matter of ADT Co. v Public Serv. Commn.*, 128 AD2d 1, 4-5). Long-distance access rates have historically been set higher than cost in order to subsidize local service, which is provided at below-cost rates (*see, e.g., Matter of Kessel v Public Serv. Commn.*, 136 AD2d 86, 101, *lv denied* 72 NY2d 805; *Matter of MCI Telecommunications Corp. v Public Serv. Commn.*, 108 AD2d 289). In setting the access charges—which, we note, undergo a series of reductions under the Plan—the PSC was entitled to draw upon its understanding of the relationship between access charges and basic telephone service, as well as its general experience and specialized knowledge, in assessing costs and translating them into rates. Indeed, "such technical matters are within the particular expertise of the PSC and due deference must be accorded its view" (*Matter of Brooklyn Union Gas Co. v Public Serv. Commn.*, 101 AD2d 453, 456-457).

---

**3.** This provision excludes "proceedings involving the validity or application of rates, facilities, or practices of public utilities or carriers" from its prohibition against ex parte communications between agency members assigned to render a decision in an adjudicatory proceeding and any party to such proceeding.

Moreover, the PSC can set rates based upon considerations other than costs (*see, Matter of New York State Council of Retail Merchants v Public Serv. Commn., supra*, at 671-672; *Matter of Rochester Gas & Elec. Corp. v Public Serv. Commn., supra*, at 10). In our view, the access rates established by the PSC have not been proven by petitioners to be irrational or arbitrary and capricious. Similarly, the American Association of Retired Persons has failed to demonstrate that the residential service pricing under the Plan is without reasonable support in the record or arbitrary and capricious.

Petitioners also argue that the "No Suspension" provision of the Plan—NY Tel is permitted to engage in new service offerings and its tariff filings for such services will be deemed reasonable and thus not subject to suspension by the PSC—constitutes an improper abdication of the PSC's authority. In addition, they argue that the PSC's commitment not to institute a general rate proceeding against NY Tel during the duration of the Plan constitutes a significant deregulation of NY Tel. While there is no doubt that the Plan, which provides for a performance-regulatory scheme, is indeed novel, we do not feel that it results in an improper abdication of the PSC's regulatory power or in the improper "deregulation" of NY Tel. Each contention will be discussed ad seriatim.

While new service offerings are generally subject to PSC investigations and suspensions (*see*, Public Service Law § 92 [2] [e]), we note first that this suspension power is purely discretionary. Moreover, the "No Suspension" rule applies only to those rates already in accord with the Public Service Law, the PSC's rules and regulations, applicable PSC orders and price requirements set forth in the Plan. Additionally, the PSC reserved itself the right to suspend rates not in compliance with these requirements or upon a showing of significant financial or irreparable harm to competitors.

In exercising its statutory responsibilities to ensure just and reasonable rates, "the PSC has broad authority with respect to the factors to be considered and formula or formulae to be used, subject only to the limitation that there must be a rational basis and reasonable support in the record for the judgment exercised" (*Matter of Rochester Tel. Corp. v Public Serv. Commn.*, 201 AD2d 31, 35, *affd* 87 NY2d 17). Given the safeguards outlined in the Plan with respect to the "No Suspension" rule, we cannot conclude that it is irrational. Rather, we find that it represents a permissible implementation of the PSC's broad discretion in selecting the means for achieving

"just and reasonable" rates and economically sound and efficient services.

By liberating NY Tel from earning limits and various pricing constraints in exchange for an absolute obligation to fix service prices, reduce other prices to specified levels and commit to certain service quality improvement and competition-enhancing measures or be subject to penalties, the Plan certainly represents a new and perhaps forward-looking form of regulation. Although the success of the Plan lies almost exclusively on the competency of NY Tel, NY Tel remains under the watchful regulatory eye of the PSC. The Plan ensures that rates remain "just and reasonable" throughout its duration and provides sufficient regulatory protection by reserving to the PSC the right to modify it in the event of a substantial unforeseen change in circumstances or to terminate it in the event NY Tel violates or fails to abide by any material condition. The PSC's regulatory oversight is also provided for under the three-year service quality checkpoint.[4] Indeed, the PSC has retained the ability to terminate the Plan if material service quality improvements are not forthcoming by NY Tel.

The Plan represents a balanced, albeit nontraditional, scheme to regulate telecommunication while fostering competition and improving customer service throughout the State. Petitioners' contrariwise suggestions notwithstanding, ingenuity and novelty—and even some degree of uncertainty—do not equate with irrationality, abdication of authority or complete deregulation. In sum, we conclude that the Plan, when reviewed in its entirety, including the provisions permitting NY Tel to offer services on an individual case basis, approving the Diffusion Program and permitting NY Tel to retain the set-aside funds, is rational and represents a balanced product of the PSC's regulatory experience and judgment. Consequently, "there is no predicate for judicial intervention here" (*Matter of County of Orange v Public Serv. Commn.*, 37 NY2d 762, 765, *supra*).

Petitioners' remaining contentions have been reviewed and found unpersuasive.

---

4. Pursuant to this provision, unless certain "checkpoint" requirements are met by NY Tel, all rebate schedules and penalties will be doubled in all subsequent years of the Plan. The PSC also reserved in itself the option of responding to checkpoint failures by requiring changes in NY Tel's *management compensation* plan to ensure greater sensitivity to service quality objectives.

CARDONA, P. J., WHITE, CASEY and SPAIN, JJ., concur.

Adjudged that the determinations are confirmed, without costs, and petition dismissed.