[748 NYS2d 174]

In the Matter of COUNTY OF WESTCHESTER et al., Appellants, v MAUREEN O. HELMER, as Chair of the Public Service Commission of the State of New York, et al., Respondents. (And Another Related Proceeding.)

Third Department, July 25, 2002

### APPEARANCES OF COUNSEL

*Epstein, Becker & Green P.C.,* New York City (*Alan D. Scheinkman* of counsel), for appellants.

*Lawrence G. Malone,* New York State Public Service Commission, Albany (*Jonathan D. Feinberg* of counsel), for Maureen O. Helmer and others, respondents.

*Mary L. Krayeske,* New York City, for Consolidated Edison Company of New York, Inc., respondent.

*Michael A. Cardoza, Corporation Counsel,* New York City (*Janet L. Zaleon* of counsel), for New York City, respondent.

### OPINION OF THE COURT

Cardona, P.J.

In May 1996, respondent Public Service Commission (hereinafter the PSC) issued an opinion mandating the restructuring of the electric utility industry within the state (*see,* 1996 NY PSC Op No. 96-12). Among the goals of the reorganization was increased competition and deregulation within the industry, with an eye to greater consumer choice and an overall reduction of energy rates (*see, id.; see also, Matter of Energy Assn. of N.Y. State v Public Serv. Commn. of State of N.Y.,* 169 Misc 2d 924, *affd* 273 AD2d 708, *lv denied* 95 NY2d 765). Pursuant to the PSC's opinion, the state's electrical suppliers and retailers, including respondent Consolidated Edison Company of New York, Inc. (hereinafter Con Ed), were ordered to file rate/restructuring plans.

In September 1997, Con Ed and other parties entered into a negotiated settlement (hereinafter the 1997 settlement), later

adopted by the PSC, which established a multiphase, five-year rate structure aimed at reducing Con Ed's cumulative rates by more than $1 billion while permitting Con Ed the opportunity to recover certain "strandable costs" it incurred as a result of the transition away from the regulated electricity market.[1] The 1997 settlement also implemented a "retail access program," whereby consumers in Con Ed's southern New York service territory would have the option of purchasing energy directly from alternative suppliers, but would continue to receive delivery of the energy through Con Ed's distribution network, regardless of the supplier. Electric rates were separated into two principal components: electrical generation, or commodity, costs and delivery costs. It was contemplated under the same agreement that commodity rates would be subject to an exchange market overseen by the New York Independent System Operator (hereinafter NYISO). The 1997 settlement expressly provided that delivery rates would be uniform throughout Con Ed's service area, but expressly left open the question of whether the citizens of petitioner County of Westchester would be subject to a different delivery rate once the NYISO became fully operational.

Thereafter, in anticipation of the expected start-up of the NYISO, Con Ed filed an implementation plan and rate structure for phase three of its retail access program. Following extensive public comment, the PSC ultimately issued orders dated February 28, 2000 and April 13, 2000. The orders allowed Con Ed to recoup its market costs for energy by imposing a Market Supply Charge (hereinafter MSC) upon its full-service customers only. In contrast, all of Con Ed's ratepayers, whether full-service or delivery only, could be subject to a Monthly Adjustment Clause charge (hereinafter MAC) aimed at passing on Con Ed's strandable costs to the consumer. Under this MSC/MAC system, New York City and Westchester County consumers pay uniform MSC rates because the MSC is tied to full-service rates that are essentially equal. However, as relevant here, the PSC specifically authorized the MAC to be higher in Westchester County than in New York City, resulting in higher delivery rates for Westchester County customers. The higher delivery rates reportedly act to offset the higher energy supply costs experienced in New York City. Because of the delivery rate disparity, Westchester County estimates that

---

1. These unavoidable costs include losses from the sale of assets mandated by the agreement and the cost of energy purchased under preexistent contracts at a price in excess of current market prices.

its residents inequitably shoulder 62% of the MAC, as opposed to the 38% paid by New York City customers, even though New York City residents consume 88% of Con Ed's electric energy. In light of Westchester County's objections thereto, the PSC agreed to address the issue of disparate delivery rates in a separate proceeding or in subsequent discussions related to Con Ed's restructuring and rate plan (*see*, Pub Serv Commn Order Instituting Proceedings, Case 00-E-1208 [July 20, 2000]).[2]

In June 2000, petitioners commenced a combined CPLR article 78 proceeding and declaratory judgment action challenging the PSC's February and April 2000 orders. By judgment entered February 13, 2001, Supreme Court (Cobb, J.) dismissed the petition and declared that the PSC acted rationally. During the pendency of the above proceeding, Con Ed and the PSC entered into an additional settlement agreement concerning, inter alia, Con Ed's merger with another utility. In its order, the PSC allowed the MAC mechanism to continue, but nonetheless permitted petitioners and Con Ed "to proceed in the separate proceeding on the MAC delivery rate differential issues" (2000 NY PSC Op No. 00-14, at 31). Later, in November 2000, the PSC labeled Con Ed's tariff filings (which implemented the MAC) "permanent," but again noted that Westchester County's concerns in reference to the MAC would be addressed in a separate proceeding (*see*, Pub Serv Commn Order Allowing Tariff Amendments to Become Permanent, Case 96-E-0897 [Nov. 30, 2000]).

In March 2001, petitioners[3] commenced a second combined CPLR article 78 proceeding and declaratory judgment action challenging, inter alia, the latest orders of the PSC. By judgment entered August 22, 2001, Supreme Court (Keegan, J.) dismissed, on collateral estoppel grounds, so much of the petition as related to petitioners' challenge to the divergent delivery rates in Westchester County and New York City. The remaining causes of action were transferred to this Court pursuant to CPLR 7804 (g). Petitioners now appeal this latest judgment, as well as Supreme Court's February 2001 judgment.

---

2. Despite the pendency of this proceeding, the parties do not argue that consideration of the propriety of the MAC, which has already been implemented, is not ripe for review.

3. We note that although various members of the Westchester County Board of Legislators were named as petitioners in the June 2000 proceeding/action, they are not included in the second proceeding/action. Since this distinction is not significant, the term "petitioners" in the decision will collectively refer to all named petitioners.

We initially observe that "the PSC's determinations in setting just and reasonable rates 'are entitled to deference and may not be set aside unless they are without rational basis or without reasonable support in the record' " (*Matter of New York Tel. Co. v Public Serv. Commn. of State of N.Y.*, 95 NY2d 40, 48, quoting *Matter of Rochester Tel. Corp. v Public Serv. Commn. of State of N.Y.*, 87 NY2d 17, 29; *see, Matter of MCI Telecom. Corp. v Public Serv. Commn. of State of N.Y.*, 231 AD2d 284, 292). This deference stems from the highly technical nature of utility rate making and the particular expertise possessed by the PSC (*see, Matter of New York Tel. Co. v Public Serv. Commn. of State of N.Y.*, *supra* at 48). While it is argued that this deference is no longer relevant in the post-1997 climate of nationwide utility deregulation, we find no reason to reject the principle that resolution of utility rate cases turns upon " 'problems of a highly technical nature, the solutions to which in general have been left by the Legislature to the expertise of the [PSC]' " (*id.* at 48, quoting *Matter of Abrams v Public Serv. Commn. of State of N.Y.*, 67 NY2d 205, 211-212).

Turning to the merits, petitioners maintain that the MAC delivery charges reflected in the challenged PSC opinions which are not based on usage discriminate against ratepayers in Westchester County in favor of New York City ratepayers within the same class in violation of Public Service Law § 65 (3) (*see, Matter of Lefkowitz v Public Serv. Commn.*, 40 NY2d 1047). It has been held that "rate discrimination can be countenanced only if it is either cost-justified or if some other rational basis is to be found in the record" (*Matter of New York State Council of Retail Merchants v Public Serv. Commn. of State of N.Y.*, 45 NY2d 661, 669; *see, Matter of Multiple Intervenors v Public Serv. Commn. of State of N.Y.*, 154 AD2d 76, 80; *Matter of Forbes Personnel v Public Serv. Commn.*, 74 AD2d 690, 691; *Matter of Oil Heat Inst. of Long Is. v Public Serv. Commn. of State of N.Y.*, 72 AD2d 829, 830, *lv denied* 49 NY2d 707). Upon review of the record, we conclude that a sufficient rationale for the delivery rate disparity has been stated.

Notably, at the time of the PSC's initial orders, the NYISO had for the first time established, on the basis of actual market prices, differing commodity prices for Westchester County and New York City. This resulted in New York City residents paying roughly two cents per kilowatt hour more for the generation of their electricity than their Westchester County counterparts. Fearing the "disruptive and unacceptable

impacts" of forcing New York City customers alone to shoulder an estimated two percent rate increase, the PSC effectively apportioned the increased generation costs across all of Con Ed's consumer base. As Supreme Court recognized, the PSC's February and April 2000 orders actually "equalized rates paid by the County of Westchester and the City of New York" and, thus, temporarily maintained the historically equal full-service rates in the two areas. Significantly, under the PSC scheme, *both* localities reap the benefit of rate decreases established in the 1997 settlement, even though Westchester County is deprived of the greater decreases which would be available if its delivery costs were equalized with that of New York City. We note additionally that the PSC expressly recognized the volatility of the transition to a deregulated market and decided to proceed with caution on a step-by-step basis as more information was compiled. Under the particular circumstances and, at this time, we cannot conclude that this approach is irrational.

 Turning next to the matters raised in petitioners' second petition, we initially conclude that Supreme Court (Keegan, J.) correctly determined that certain aspects of the petition were barred by the doctrine of collateral estoppel. The doctrine applies where the party seeking to invoke it can prove "that the identical issue was decided in the prior action and is decisive in the current action, and that the party to be precluded from relitigating the issue had a full and fair opportunity to contest the prior determination" (*New York State Dam Ltd. Partnership v Niagara Mohawk Power Corp.*, 222 AD2d 792, 794, *lv dismissed and denied* 87 NY2d 1041). Here, our review of the March 2001 petition reveals that petitioners specifically attacked that portion of the November 2000 order that continued the practice of differentiating delivery rates in Westchester County and New York City and, thus, sought to relitigate the propriety of the MAC as imposed upon these localities. That was an issue previously adjudicated, upon petitioners' application, by Supreme Court in its February 13, 2001 judgment. Although the latest PSC determination refers to the MAC as "permanent" (Pub Serv Commn Order Allowing Tariff Amendments to Become Permanent, Case 96-E-0897, at 4 [Nov. 30, 2000]), this distinction is not dispositive especially since, as previously noted, the issue of disparate delivery rates remains open for PSC consideration.

 As for those claims in the March 2001 petition which were transferred to this Court, petitioners' fifth and sixth

causes of action challenge the PSC's order adopting a settlement agreement between Con Ed and other parties which they claim perpetuated the "subsidization" of an inefficient steam production operation in Manhattan. Since 1978, the PSC's rate orders have mandated that certain costs related to the production of steam within Con Ed's Manhattan steam plants be apportioned among electrical consumers elsewhere in the Con Ed service area. Petitioners contend that the continuation of this practice is unfair and should be eliminated. The record indicates, however, that immediate elimination of the steam subsidy would result in a mere "1% rate reduction for electric customers, while increasing steam base rates by 20%." The PSC maintains that such a drastic increase in steam rates would, additionally, depress the market for steam, driving steam consumers to electric power and thereby increasing an already high demand for electricity in New York City. Since, as previously stated, the PSC "can validly set differential rates based upon considerations other than cost, as long as they are otherwise rationally based" (*Matter of Multiple Intervenors v Public Serv. Commn. of State of N.Y.*, 154 AD2d 76, 80, *supra*; *see, Matter of Forbes Personnel v Public Serv. Commn.*, 74 AD2d 690, 691, *supra*), we find no reason to disturb this determination.

The remaining arguments raised by petitioners have been examined and found to be unpersuasive.

MERCURE, SPAIN, CARPINELLO and MUGGLIN, JJ., concur.

Ordered that the judgments are affirmed, without costs.