[763 NYS2d 352]

In the Matter of NEW YORK STATE ELECTRIC & GAS CORPORA-
TION, Appellant, v PUBLIC SERVICE COMMISSION OF THE
STATE OF NEW YORK et al., Respondents.

Third Department, July 17, 2003

**APPEARANCES OF COUNSEL**

*Davis, Polk & Wardwell*, New York City (*Guy Miller Struve* of counsel), and *Huber, Lawrence & Abell*, New York City, for appellant.

*Dawn K. Jablonski, Public Service Commission*, Albany (*Jonathan D. Feinberg* of counsel), for Public Service Commission of the State of New York, respondent.

*Couch White L.L.P.*, Albany (*Barbara S. Brenner* of counsel), for Corning Incorporated, respondent.

*Brickfield, Burchette, Ritts & Stone*, Washington, D.C. (*James W. Brew* of counsel), for Nucor Steel Auburn, Inc., respondent.

**OPINION OF THE COURT**

CREW III, J.

In 2001, respondent Corning Incorporated began evaluating

potential sites for the location and construction of a new $260 million manufacturing facility. While considering one such site in Steuben County, Corning approached petitioner regarding possible energy rates for the new facility. Specifically, Corning sought a discount of four cents per kilowatt hour (hereinafter kWh) from the standard tariff that otherwise would have applied. Petitioner, however, indicated that it could offer only a $0.0325 per kWh discount. When petitioner and Corning could not reach an agreement as to the discount rate, the matter was submitted to respondent Public Service Commission (hereinafter the PSC) for resolution. By order dated October 31, 2001, the PSC concluded that given the substantial revenues that Corning's new facility would generate in and for this state, a four-cent per kWh discount over a period of 10 years would be reasonable. To that end, petitioner was directed to enter into negotiations with Corning for a flex rate contract.

Subsequent discussions between petitioner and Corning failed to produce an agreement as the parties could not come to terms regarding, inter alia, whether a floor price of marginal cost plus one cent per kWh should be included in the flex rate contract. Ultimately, on April 2, 2002, the PSC issued an order compelling petitioner to enter into a flex rate contract with Corning, pursuant to the terms of which Corning would receive the requested discount rate and the one-cent per kWh contribution would be waived. Petitioner's request for a rehearing was denied by order dated May 23, 2002, and Corning was directed to commence an enforcement action against petitioner compelling execution of the flex rate contract.

In an entirely separate yet not dissimilar transaction, respondent Nucor Steel Auburn, Inc. purchased a steel production facility in Cayuga County in April 2001. Again, a dispute arose with petitioner with regard to the price that Nucor would pay for electricity and, more particularly, whether Nucor would be entitled to an Economic Development Zone Incentive rate. The matter proceeded to the PSC, which, by order dated November 2, 2001, directed that petitioner and Nucor negotiate a new flex rate contract.

As with the Corning negotiations, however, petitioner's discussions with Nucor failed to produce the desired agreement, and the parties returned to the PSC. By order dated March 25, 2002, the PSC directed petitioner to enter into a flex rate contract with Nucor under terms substantially similar to those proposed by Nucor. Specifically, the PSC again waived the marginal cost plus one-cent per kWh floor price, finding

that the economic benefits afforded to petitioner's service territory more than justified the waiver of the one-cent contribution. Thereafter, by order dated May 23, 2002, the PSC denied petitioner's request for a rehearing and directed Nucor to commence an enforcement action to compel petitioner to execute the flex rate contract.

Petitioner subsequently commenced this proceeding pursuant to CPLR article 78 seeking to annul and set aside the PSC's orders directing petitioner to enter into the respective contracts with Corning and Nucor, as well as the orders denying petitioner's applications for a rehearing and authorizing enforcement actions against petitioner. Supreme Court dismissed petitioner's application in its entirety and, in so doing, rejected petitioner's claims that the PSC lacked the authority to compel petitioner to enter into flex rate contracts with Corning and Nucor, engaged in unlawful discrimination by granting Corning and Nucor preferential service rates and acted arbitrarily and capriciously in waiving the one-cent per kWh contribution. This appeal by petitioner ensued.

Petitioner initially contends that the PSC acted in excess of its authority and jurisdiction when it compelled petitioner to enter into flex rate contracts with Nucor and Corning as there is no provision in the Public Service Law granting such power to the PSC. To be sure, the PSC "possesses only those powers expressly delegated to it by the Legislature, or incidental to its expressed powers, together with those required by necessary implication to enable [it] to fulfill its statutory mandate" (*Matter of Niagara Mohawk Power Corp. v Public Serv. Commn. of State of N.Y.*, 69 NY2d 365, 368-369 [1987]). Where, as here, it is alleged that the PSC "has acted outside the scope of its legitimate power, we [must] engage[ ] in 'a realistic appraisal of the * * * situation to determine whether the administrative action reasonably promotes or transgresses the pronounced legislative judgment' " (*id.* at 372, quoting *Matter of Consolidated Edison Co. of N.Y. v Public Serv. Commn. of State of N.Y.*, 47 NY2d 94, 102 [1979], *revd on other grounds* 447 US 530, 544 [1980]). With these principles in mind, we turn to the statute at issue.

Public Service Law § 66 sets forth the general powers of the PSC with regard to gas and electrical services and providers. Insofar as is relevant to this appeal, Public Service Law § 66 (12-b) (a) vests the PSC with the following powers:

"1. to designate as economic incentive areas specific

areas in which reduced economic activity, unemployment and underutilization of utility facilities justifies the approval of reduced incentive rates for utility services, and to promulgate criteria for identifying such areas and customers eligible for such rates. Upon application of a utility corporation the [PSC] shall authorize special economic incentive rates in such areas to such customers and for such periods of time as the [PSC] finds will best effectuate the purposes of this subdivision. * * * 2. to designate or form classes of customers as appropriate for special rates or tariffs, in order to prevent loss of such customers, or to attract new customers where necessary to maintain economic use of utility facilities."

Additionally, Public Service Law § 66 (12-b) (b) permits the PSC to "authorize utility corporations to contract with existing or prospective industrial and commercial customers to wheel or deliver electricity or gas purchased directly by such customers, provided that the [PSC] finds that such arrangements are in the overall best interest of the rate payers of the corporation, and that the rates and fees for the services provided adequately compensate the corporation for the use of its facilities."

█ It cannot seriously be argued that the cited provisions expressly authorize the PSC to compel petitioner or similarly situated utility corporations to enter into flex rate contracts with a particular customer. There simply is no language in Public Service Law § 66 (12-b) to that effect. We nonetheless are persuaded that the express power to "designate or form classes of customers as appropriate for special rates or tariffs, in order to prevent loss of such customers, or to attract new customers where necessary to maintain economic use of utility facilities" (Public Service Law § 66 [12-b] [a] [2]), coupled with the legislative history underlying Public Service Law § 66 (12-b) and the PSC's general rate-making powers as set forth in Public Service Law § 66 (5) and § 72, provide ample authority for the PSC's actions in this regard.

With regard to the power to "designate or form classes of customers as appropriate for special rates or tariffs" (Public Service Law § 66 [12-b] [a] [2]), we reject petitioner's contention that such language only empowers the PSC to approve such contracts or actions when initially proposed by a utility. The statute on its face imposes no such limitation upon the PSC's powers. In any event, petitioner's argument on this point

fails upon close examination of the relevant legislative history. The addition of subdivision (12-b) to Public Service Law § 66 was expressly designed "to retain and attract businesses, and provide employment opportunities in areas undergoing severe business dislocation and economic hardship" (Sponsor's Mem in Support, L 1983, ch 626, 1983 NY Legis Ann, at 272). To that end, special incentive rates may be applied "when the [PSC] finds that they are appropriate to attract new customers or to prevent the loss of customers" (id.). Given the overall purpose of Public Service Law § 66 (12-b), we reject the suggestion that the PSC may only fulfill such statutory mandate at the request of a utility corporation.

Further support for the PSC's actions here may be found in Public Service Law § 66 (5), which provides, in relevant part, as follows:

> "Whenever the [PSC] shall be of opinion, after a hearing had upon its own motion or upon complaint, that the rates, charges or classifications or the acts or regulations of any such person, corporation or municipality are unjust, unreasonable, unjustly discriminatory or unduly preferential or in anywise in violation of any provision of law, the [PSC] shall determine and prescribe in the manner provided by and subject to the provisions of [Public Service Law § 72] the just and reasonable rates, charges and classifications thereafter to be in force for the service to be furnished notwithstanding that a higher or lower rate or charge has heretofore been prescribed by general or special statute, contract, grant, franchise condition, consent or other agreement."

Similarly, Public Service Law § 72 authorizes the PSC to:

> "by order, fix just and reasonable prices, rates and charges for gas or electricity to be charged by such corporation or person, for the service to be furnished notwithstanding that a higher or lower price has been theretofore prescribed by general or special statute, contract, grant, franchise condition, consent or other agreement * * *. Any such change in price shall be upon such terms, conditions or safeguards as the [PSC] may prescribe."

These provisions plainly illustrate that "[t]he Legislature has granted the PSC broad regulatory authority over various pub-

lic utilities in the highly technical field of setting just and reasonable rates" (*Matter of Rochester Tel. Corp. v Public Serv. Commn. of State of N.Y.*, 87 NY2d 17, 28 [1995]).

In light of the foregoing, we are of the view that interpreting Public Service Law § 66 (12-b) (a) (2) in a manner that empowers the PSC to compel petitioner to enter into the respective flex rates contracts with Corning and Nucor is "required by necessary implication to enable the [PSC] to fulfill its [aforementioned] statutory mandate" (*Matter of Niagara Mohawk Power Corp. v Public Serv. Commn. of State of N.Y.*, 69 NY2d 365, 369 [1987], *supra*). Thus, based "upon 'a realistic appraisal' " of the situation before us (*Matter of New York Tel. Co. v Public Serv. Commn. of State of N.Y.*, 271 AD2d 35, 39 [2000], *lv denied* 95 NY2d 762 [2000], quoting *Matter of Consolidated Edison Co. of N.Y. v Public Serv. Commn. of State of N.Y.*, 47 NY2d 94, 102 [1979], *supra*), we are persuaded that the PSC's conduct here reasonably promoted the stated objectives of Public Service Law § 66 (12-b). To hold otherwise would essentially grant a utility such as petitioner unilateral veto power over the PSC's reasonable determination that a particular customer is entitled to a special rate or tariff in order to retain and/or attract new business opportunities in economically depressed areas of the state, which would completely thwart the very purpose of Public Service Law § 66 (12-b).

■ Petitioner next contends that special rates may be extended only to groups of customers and not individual entities such as Nucor and Corning. As our use of the phrase "a particular customer" in the preceding paragraph suggests, we find this argument to be unpersuasive. Admittedly, Public Service Law § 66 (12-b) (a) (2) refers to the PSC's power "to designate or form classes of customers as appropriate for special rates or tariffs," and petitioner argues that the term "classes" necessarily refers to a group of customers, not a single entity. While we are mindful of the rule of construction that requires us to afford the words contained within a statute their plain and ordinary meaning (*see Hudson Deepwater Dev. v City of Troy*, 299 AD2d 801, 802 [2002]), we are equally mindful that our "primary consideration * * * in interpreting a statute is to 'ascertain and give effect to the intention of the Legislature' " (*Riley v County of Broome*, 95 NY2d 455, 463 [2000], quoting McKinney's Cons Laws of NY, Book 1, Statutes § 92 [a], at 177). Indeed, such legislative history " 'is not to be ignored, even if words be clear' " (*Riley v County of Broome, supra* at 463, quoting McKinney's Cons Laws of NY, Book 1, Statutes

§ 124, at 252). Given the overriding purpose of the statute at issue, we again conclude that the legislative history compels a finding that the PSC may extend special rates to a single customer in order to retain or attract business opportunities in this state. To hold otherwise would render the PSC powerless to act where, as here, a single, large, revenue-producing entity was on the verge of leaving New York or selecting another state for its facility as a result of unduly high energy rates. Requiring the PSC to essentially sit quietly by while a company removes substantial revenues or job opportunities from this state plainly is not what the Legislature envisioned when it enacted Public Service Law § 66 (12-b).

■ Nor are we persuaded that the PSC violated the antidiscrimination provision contained in Public Service Law § 66 (12) (d) when it directed petitioner to execute the underlying flex rate contracts. In this regard, Public Service Law § 66 (12) (d) provides:

> "No utility shall charge, demand, collect or receive a greater or less or different compensation for any service rendered or to be rendered than the rates and charges specified in its schedule filed and in effect; nor shall any utility refund or remit in any manner or by any device any portion of the rates or charges so specified, nor extend to any person any form of contract or agreement, or any rule or regulation, or any privilege or facility, except such as are regularly and uniformly extended to all persons under like circumstances."

Rate discrimination, however, "can be countenanced * * * if it is either cost-justified or if some other rational basis is to be found in the record" (*Matter of New York State Council of Retail Merchants v Public Serv. Commn. of State of N.Y.*, 45 NY2d 661, 669 [1978]; *see Matter of County of Westchester v Helmer*, 296 AD2d 68, 72 [2002], *lv denied* 99 NY2d 502 [2002]).

Preliminarily, despite the fact that the statute, on its face, only precludes a utility from, inter alia, offering preferential contracts or agreements, we are of the view that the antidiscrimination provisions of Public Service Law § 66 (12) (d) apply with equal force to the PSC (*cf. Matter of Lefkowitz v Public Serv. Commn.*, 40 NY2d 1047, 1048 [1976] [holding that the antidiscrimination provisions of Public Service Law § 65 (2) and (3) apply to the PSC]). Nonetheless, all the statute requires is that the PSC treat Corning and Nucor in the same fashion as similarly situated customers. Unfortunately for petitioner,

Corning and Nucor are unique entities and, in the absence of any proof that the PSC has failed to extend similar rates to other large, revenue-producing entities, petitioner cannot establish that the PSC's conduct here was discriminatory. Moreover, even assuming that the PSC indeed granted Corning and Nucor preferential treatment, given the substantial economic benefits and contributions to be derived from Corning and Nucor's respective facilities, we cannot say that the PSC's determination in this regard was irrational.*

■ Finally, we reject petitioner's contention that the PSC acted arbitrarily and capriciously in waiving the floor price of marginal cost plus one cent per kWh in the contracts at issue. The final paragraph of Public Service Law § 66 (12-b) (a) provides that "[a]ny such special rate or tariff shall be so designed as to recover the incremental cost of providing service to such customers and to contribute to the common costs which otherwise would be borne by other customers." Notably, the statute does not specify the precise manner in which this must be accomplished. Although the PSC published Opinion No. 94-15 in July 1994, which provided, in relevant part, that "[a] floor price for flexible rates will be calculated by each utility, and will generally be set at no lower than the marginal cost of service to the customer plus 1cent/kWh" (34 NY PSC 1007, *35 [Op No. 94-15]), the PSC revisited and ultimately waived the floor price in the Corning and Nucor contracts. In so doing, the PSC found that the imposition of such a provision would defeat the very purpose of the respective flex rate contracts—namely, to attract and retain those revenue-producing entities in this state and, more importantly, that as a result of the rates afforded Corning and Nucor, those entities "will always pay more than marginal costs, with a contribution towards system costs." Given this finding, and in view of the fact that Public Service Law § 66 (12-b) (a) mandates only that the incremental cost of providing service be recovered and that a contribution to common costs be made, not the precise manner in which this must be accomplished, we cannot say that the PSC's decision to waive the price floor requirement in the underlying contracts was arbitrary and capricious. Petitioner's remaining argu-

---

* Corning is investing $260 million in a facility that will generate 300 new jobs paying $21 million in annual wages and contribute $2 million in state taxes. This proposal represented "the largest single investment announced in [petitioner's] service territory during 2001." Similarly, Nucor, which is petitioner's largest single-site customer, employs approximately 300 people at its facility.

ments, to the extent not specifically addressed, have been examined and found to be lacking in merit.

CARDONA, P.J., PETERS and SPAIN, JJ., concur.

Ordered that the judgment is affirmed, without costs.