OPINION OF THE COURT
Levine, J.
The State Public Service Commission (PSC) appeals from the Appellate Division’s annulment of its order directing petitioner New York Telephone Company (NYT) to pass on to ratepayers the intrastate portion of its profit from the sale of Bell Communications Research, Inc. (Bellcore), a shared subsidiary of the Regional Bell Operating Companies (RBOCs). We reverse and remit.
Factual and Procedural History
NYT’s interest in Bellcore is traceable to the 1984 antitrust divestiture of AT&T’s wholly owned local operating companies (including NYT) into seven RBOCs, one of which was NYNEX, NYT’s new parent company. Prior to that time, those operating subsidiaries obtained research and development and other technical services from another wholly owned AT&T subsidiary, Bell Telephone Laboratories (Bell Labs). Bellcore was created as part of the divestiture plan, to be owned jointly by the seven RBOCs and to provide the same services Bell Labs had previously furnished to AT&T’s local telephone operating subsidiaries.
By 1995, as the seven RBOCs became more diverse and the possibility of competition among them increased, it became less feasible for them collectively to rely upon a single source for technological research and development. Therefore, they decided to sell Bellcore.
At the time that the plan to sell Bellcore became known, NYT’s 1994 request for a multiyear rate determination, *46 referred to as the Performance Regulation Plan (PRP), was pending before the PSC. Hearings on the request had been previously concluded. Upon disclosure of the prospective sale of Bellcore, various parties to the PRP rate proceeding moved to reopen the hearings for consideration of the impact of NYT’s profits from that sale upon intrastate telephone rates under the plan. NYT argued against reopening of the hearings but agreed that if and when Bellcore was sold, the PSC would “retain the authority to determine the appropriate ratemaking treatment of any proceeds, notwithstanding any provision of the [PRP].” Based upon NYT’s position, the PSC refrained from reopening the rate hearings. In August 1995, the PSC approved the PRP, explicitly reserving the authority to adjust rates on account of the sale of Bellcore.
In November 1996, the Bellcore Board of Directors, composed of officers of the RBOCs, formally resolved to sell Bellcore to an unrelated company called Science Applications International Corporation. In July 1997, NYT filed a petition with the PSC seeking a declaratory ruling disclaiming jurisdiction over the sale of Bellcore or, in the alternative, approval of the proposed sale. On November 7, 1997, the PSC approved the sale of Bell-core. It further ordered NYT to submit a plan for passing on $19.5 million, the intrastate portion of its profit on the sale of Bellcore, to its ratepayers by giving them a surcredit of approximately $2.50 each in a future billing.
NYT commenced this CPLR article 78 proceeding to annul the November 7 order to the extent that it required the distribution of the surcredit. Supreme Court confirmed the PSC’s order and dismissed the petition. The Appellate Division reversed (258 AD2d 234), holding that the PSC lacked jurisdiction over the sale and that it could not order the surcredit under its rate-making authority, an “after-the-fact justification” (id., at 238). The Court also concluded that even if the PSC had rate-making jurisdiction, its determination was arbitrary, capricious and legally erroneous, and should be annulled. We granted leave to appeal.
Discussion
The primary ground urged by the PSC and interveners, the State Attorney General and State Consumer Protection Board, for upholding the order for a surcredit is that it falls within the agency’s authority to regulate rates for telephone service (see, *47 Public Service Law § 91 [1]; § 97 [1]; § 4 [1]) and has a rational basis. NYT contends that the PSC is barred from offering that justification because in ordering the surcredit the agency relied exclusively on its jurisdiction to approve or disapprove the Bellcore sale itself. NYT argues that the PSC’s subsequent reliance on its rate-making authority violates the rule limiting judicial affirmance of an administrative determination to the ground applied by the agency (citing Matter of Scanlan v Buffalo Pub. School Sys., 90 NY2d 662, 678).
The record does not support NYT’s position that the sole original basis for the PSC’s surcredit order was its assertion of jurisdiction over the sale of Bellcore. But for NYT’s stipulation in the PRP rate proceeding that the PSC retained jurisdiction “to determine the appropriate ratemaking treatment of any proceeds” (emphasis supplied) from the Bellcore sale, the PSC would have granted the motion to reopen the hearings in that proceeding and, presumably, then gone on to order the surcredit before approving the PRP. Instead, at NYT’s behest, the rate-making aspect of the Bellcore sale was bifurcated in the PRP proceeding. The PSC’s order approving the PRP expressly reserved judgment and jurisdictional authority to impose “rate reductions” with respect to “proceeds from the sale of assets that were funded in whole or in part by [New York Telephone] ratepayers” (emphasis supplied, brackets in original). Then, in the surcredit order itself, the explicit justification for imposing that one-time rate adjustment was precisely the same one the agency cited in the PRP approval when it reserved authority to reduce rates to reflect any eventual sale. The PSC ordered that the intrastate portion of NYT’s Bellcore profits be passed on to its customers, because “NYT’s interest in Bellcore has been funded through payments from ratepayers” (emphasis supplied).
The foregoing excerpts from the record are sufficient to demonstrate the continued and consistent assertion of rate regulation authority by the PSC with respect to the Bellcore sale: from the denial of the motion to reopen the hearings in the PRP rate proceeding, through the approval of the PRP, to the order imposing the single instance rate reduction challenged here. As we said in Matter of Rochester Tel. Corp. v Public Serv. Commn. (87 NY2d 17, 31), “we find no reason to require the incantation of certain ‘magic’ words” to signify either the assertion or the reason behind the exercise of the PSC’s regula *48 tory power over telephone service rates.*
NYT alternatively contends that, even if the surcredit was imposed pursuant to the PSC’s rate regulation authority, the ordering of the surcredit to reflect the intrastate portion of NYT’s profit on the sale of Bellcore, a nonutility asset not included in its rate base, was contrary to well-established PSC and judicial precedents. NYT urges that both the PSC and the courts have consistently adhered to the rule that ratepayers may only be permitted to share, through rate reduction, in gains from the sale of a corporate asset of a utility when they are obligated to bear at least some of the risk of losses from any sale of that asset. The Appellate Division agreed, holding that “because ratepayers have no obligation to reimburse the utility for losses incurred on assets not held in its rate base, they are not entitled to share in the gain realized on the sale of such property” (258 AD2d, at 238).
No such rigid formula exists. Rather, our cases establish that the standard of review of all PSC rate determinations, including those involving sales of assets, is one of flexibility. Repeatedly, we have held that the PSC’s determinations in setting just and reasonable rates “are entitled to deference and may not be set aside unless they are without rational basis or without reasonable support in the record” (Matter of Rochester Tel. Corp. v Public Serv. Commn., supra, at 29; see also, Matter of Abrams v Public Serv. Commn., 67 NY2d 205, 212, 218; Matter of New York State Council of Retail Merchants v Public Serv. Commn., 45 NY2d 661, 672; Matter of Niagara Mohawk Power Corp. v Public Serv. Commn., 69 NY2d 365, 369; Matter of Campo Corp. v Feinberg, 279 App Div 302, 307, affd 303 NY 995).
Judicial deference is warranted because “[s]etting utility rates presents ‘problems of a highly technical nature, the solutions to which in general have been left by the Legislature to the expertise of the Public Service Commission’ ” (Matter of Abrams v Public Serv. Commn., supra, at 211-212, citing Matter of New York State Council of Retail Merchants v Public Serv. Commn., supra, at 672). Thus, in reviewing rate-making determinations, “the courts * * * have not insisted upon a *49 rigid approach” (Matter of Abrams v Public Serv. Commn., at 214). To the contrary, “[t]he PSC is free to entertain or ignore any particular factor, or to assign whatever weight it deems appropriate” (id., at 212).
NYT’s position would also contravene case law that the PSC is entitled to consider nonregulated asset transactions in setting rates or otherwise exercising its regulatory oversight of utilities for the benefit of ratepayers. Thus, we held in Matter of New York Tel. Co. v Public Serv. Commn. (72 NY2d 419) that even though Yellow Page advertising is not a regulated service, the PSC had jurisdiction to disapprove a contract between NYT and a nonregulated affiliated company, under which the affiliate undertook the responsibility for providing such advertising to NYT’s customers (see, id., at 423; see also, Matter of Rochester Tel. Corp. v Public Serv. Commn., supra [imputing in a rate proceeding royalty income on unregulated transactions with nonutility affiliated corporations]; Matter of General Tel. Co. v Lundy, 17 NY2d 373, 381 [overcharges by unregulated subsidiaries may be excluded from rate base]). As the Supreme Court stated in Federal Power Commn. v Conway Corp. (426 US 271), the consideration of nonjurisdictional transactions by regulators in setting utility rates for jurisdictional sales “would appear to be an everyday affair” (id., at 280; see also, Rochester Gas & Elec. Corp. v Public Serv. Commn., 754 F2d 99, 103 [2d Cir] [PSC may consider “‘non-jurisdictional activities and transactions’ in setting jurisdictional rates”]).
The PSC and court decisions NYT relies upon merely establish that ratepayer risk of loss on the sale of a utility’s assets may serve as a rational basis for imposing a rate reduction reflecting a gain on such sales (see, Matter of Spring Val. Water Co., 30 NYPSC 1831, 1840 [PSC Opn No. 90-28]; Matter of Spring Val. Water Co. v Public Serv. Commn., 176 AD2d 95, 99; Matter of New York Water Serv. Corp. v Public Serv. Commn., 12 AD2d 122, 129; Democratic Cent. Comm. v Washington Metro. Area Tr. Commn., 485 F2d 786, 806-808 [DC Cir]). The converse — that there can never be a rational basis for passing along to the ratepayers the profit from the sale of an asset when there might not have been a rate increase had the asset been sold at a loss — simply does not follow. The PSC may have a different, yet still entirely rational, basis for its determination to reflect the gain in a rate reduction.
' [3] Here, irrespective of whether a loss on the Bellcore sale could have been passed on to NYT’s ratepayers, the PSC *50 determined that NYT’s customers were entitled to the benefit of the intrastate portion of the gains on the sale, because “NYT’s interest in Bellcore has been funded through payments from ratepayers.” That ground for the PSC rate determination has the requisite “reasonable support in the record” (Matter of Rochester Tel. Corp. v Public Serv. Commn., supra, at 29; Matter of Abrams v Public Serv. Commn., supra, at 212, 218; Matter of New York State Council of Retail Merchants v Public Serv. Commn., supra, at 672). The PSC submitted affidavits from the State Consumer Protection Board’s lead analyst on telecommunications matters and a public utility auditor with expertise in the area of telecommunications regulation as it related to NYT, as well as testimony of Bellcore’s Manager for Regulatory and Financial Systems Support. All of these experts lent support to the conclusion that the rate treatment the PSC gave NYT’s payments to Bellcore for research and other services was exactly the same as if Bellcore were part of its rate base and a division of NYT rather than a separate, unrelated entity.
Thus, the experts averred that initially, NYT’s ratepayers funded Bell Labs, Bellcore’s predecessor. Prior to the breakup of AT&T, calculation of the rates for telephone service to AT&T’s and NYT’s New York customers included charges for research and development and all other Bell Labs services integral to the operation of a telephone company. After divestiture, NYT’s ratepayers continued to pay for the very same services provided by NYT’s affiliates or subsidiaries, including Bellcore. Bellcore’s prudent, fully allocable intrastate actual costs, plus a regulated rate of return, were paid for by New York ratepayers. The project costs which Bellcore charged to NYT included salaries and other direct expenses as well as indirect expenses and corporate costs. Thus, the costs paid for by NYT’s ratepayers included a portion of Bellcore’s total operating expenses as well as a return on investment paid to shareholders as dividends. The Commission authorized rate recovery of approximately $720 million to pay for Bellcore’s expenses.
In our judgment, the PSC’s justification, based on ratepayers’ funding of NYT’s interest in Bellcore, affords a rational basis for the surcredit order. Matter of Rochester Tel. Corp. v Public Serv. Commn. (87 NY2d 17, supra) supports the PSC’s exercise of its authority here. There, we upheld a PSC rate determination which imputed royalty income to the utility “to compensate ratepayers for the free transfer of intangible assets *51 to RTC’s [unregulated] affiliate” (id., at 25). Those assets included the utility’s “name and reputation” (id., at 28). In that case, the petitioner, Rochester Telephone, objected on a ground similar to that asserted by NYT here, that those assets were not part of the rate base and, hence, transactions involving them, whether donated or sold, were beyond rate-making consideration. Thus, Rochester Telephone asserted that the PSC’s order “improperly permits ratepayers to benefit from a non-rate-making asset because the utility does not earn a rate of return on the utility’s name and reputation” (id.). Notwithstanding that those intangible assets were not included in the utility’s rate base, we upheld the rate adjustment’s imputation of royalties on transfers of those assets in Rochester Tel. Corp. because “the ratepayers have borne the costs for creating value in * * * those assets” (id., at 29 [emphasis supplied]). Identically, here, because NYT’s customers bore the costs of creating the intrastate portion of Bellcore’s value, they are entitled to reap the corresponding share of NYT’s gains on the sale of Bellcore.
Even if, as NYT contends, the risk of any loss on the sale of Bellcore would have been exclusively borne by NYT’s shareholders, the reality was that in fully funding the Bellcore investment through telephone rates, NYT’s customers effectively eliminated that risk, guaranteed the maintenance of Bellcore’s value and funded Bellcore dividends to shareholders, including NYT (see, Democratic Cent. Comm. v Washington Metro. Area Tr. Commn., supra, 485 F2d, at 806 [“an investor can hardly muster any equitable support for a claim to appreciation in asset value where he has been shielded against the risk of loss on his investment, or has already been rewarded for taking on that risk”]).
Accordingly, the order of the Appellate Division should be reversed, with costs, and the matter remitted to the Appellate Division for consideration of “additional contentions” (258 AD2d, at 239) raised but not determined on the appeal to that Court.
Chief Judge Kaye and Judges Bellacosa, Smith, Ciparick, Wesley and Rosenblatt concur.
Order reversed, etc.

 Moreover, NYT waived any entitlement to additional rate hearings it may have had under Public Service Law § 97 (1). The PSC’s decision not to address the rate treatment of the sale of Bellcore when it approved the PRP was based on NYT’s explicit “understanding that no further hearings will be necessary.”