Matter of National Energy Marketers Assn. v New York State Pub. Serv. Commn. (2018 NY Slip Op 07378)





Matter of National Energy Marketers Assn. v New York State Pub. Serv. Commn.


2018 NY Slip Op 07378


Decided on November 1, 2018


Appellate Division, Third Department


McCarthy, J.P., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: November 1, 2018

525360

[*1]In the Matter of NATIONAL ENERGY MARKETERS ASSOCIATION et al., Appellants,
v
NEW YORK STATE PUBLIC SERVICE COMMISSION, Respondent. (And Another Related Proceeding.)

Calendar Date: September 4, 2018

Before: McCarthy, J.P., Devine, Aarons, Rumsey and

Pritzker, JJ.

Boies, Schiller & Flexner LLP, Armonk (Jason C. Cyrulnik of counsel), for appellants.
John J. Sipos, Public Service Commission, Albany (D. Scott Bassinson of counsel), for respondent.
Barbara D. Underwood, Attorney General, Albany (Judith N. Vale of counsel), for Department of State and another, amici curiae.



OPINION AND ORDER
McCarthy, J.P.
Appeal from a judgment of the Supreme Court (Zwack, J.), entered July 5, 2017 in Albany County, which dismissed petitioners' application, in a combined proceeding pursuant to CPLR article 78 and action for declaratory judgment, to review a determination of respondent imposing a moratorium on energy service companies' enrollments and renewals of customers who participate in utility low-income assistance programs.
In the 1980s and 1990s, respondent opened the retail energy market to energy service companies (hereinafter ESCOs) by permitting them to supply natural gas and electricity using the infrastructure of existing utility companies (see Matter of Retail Energy Supply Assn. v Public Serv. Commn. of the State of N.Y., 152 AD3d 1133, 1134-1135 [2017], lv granted 31 NY3d 902 [2018]). The primary reason for this opening of the market was to provide competition to utility providers so that energy rates would decrease (see id. at 1139). In 2012, respondent began a performance review of the state's natural gas and electricity markets that ultimately uncovered several concerns regarding ESCOs, including that they were apparently charging customers more than the utility companies were charging without offering any enhanced services in return. To redress this and other concerns, respondent issued several orders concerning ESCOs, including a February 2015 order that required ESCOs to guarantee to their low-income customers that their bills would be no higher than if they purchased gas and electricity from the utility, or that the ESCOs would include energy-related value-added services or products that would reduce the [*2]customers' overall energy bills. This Court upheld that order as a lawful exercise of respondent's rule-making power, but overturned it in part due to respondent's failure to adhere to the State Administrative Procedure Act (Matter of National Energy Marketers Assn. v New York State Pub. Serv. Commn., 152 AD3d 1122, 1122 [2017], lv granted 31 NY3d 902 [2018]; Matter of Retail Energy Supply Assn. v Public Serv. Commn. of the State of N.Y., 152 AD3d at 1137-1140). In 2015, respondent engaged in a collaborative with representatives of utility companies, ESCOs, trade organizations and consumer advocates, as well as respondent's staff, culminating in a collaborative report regarding utility low-income assistance program participants (hereinafter APPs).
In July 2016, respondent ordered a moratorium on ESCOs' enrolling and renewing of APPs. Petitioner National Energy Marketers Association (hereinafter NEM) filed a petition for an administrative rehearing, arguing, among other things, that respondent violated the State Administrative Procedure Act. In September 2016, after finding that it had complied with the State Administrative Procedure Act, respondent nevertheless modified the July 2016 order, "out of an abundance of caution," and readopted the moratorium on an emergency basis pursuant to State Administration Procedure Act § 202 (6). The September 2016 emergency order stated that the mortarium described in the July 2016 order would become effective upon publication in the State Register and remain in effect for no more than 90 days. The same notice sought public comment on whether to continue the moratorium past the expiration of the emergency order.
Petitioners thereafter commenced this combined proceeding pursuant to CPLR article 78 and action for declaratory judgment seeking an injunction against enforcement or implementation of the two orders. Petitioners also sought a temporary restraining order staying enforcement of the two orders, which Supreme Court (O'Connor, J.) granted.
On October 5, 2016, respondent filed a notice of emergency adoption and of proposed rulemaking, indicating that the September 2016 emergency order would expire on December 17, 2016. The notice stated that the objective of the moratorium was to protect APPs and the public funds they receive from being wasted on "unnecessarily higher-priced electricity and gas" when ESCOs were failing to provide services that offset those additional expenses. In December 2016, following the statutory notice and comment period (see State Administrative Procedure Act § 202 [former (1) (a) (i)]), respondent issued an order permanently precluding ESCOs from providing services to APPs, unless each ESCO applied for a waiver by assuring that the ESCO had "(a) an ability to calculate what the [APP] would have paid to the utility; (b) a willingness and ability to ensure that the customer will be paying no more than what they would have . . . paid to the utility; and (c) appropriate reporting and ability to verify compliance with these assurances." Petitioners amended the petition to challenge the December 2016 order as well. After joinder of issue, Supreme Court (Zwack, J.) dismissed the amended petition and vacated the temporary restraining order. Petitioners appeal.
Initially, petitioners' challenges to the July and September 2016 orders are moot. The July order was superseded by the September emergency order, which expired by its own terms in December 2016. Thus, the rights of the parties are no longer affected by those prior orders, and any determination regarding their validity would have no practical effect (see Matter of NRG Energy, Inc. v Crotty, 18 AD3d 916, 918-919 [2005]; Matter of Law Enforcement Officers Union, Dist. Council 82, AFSCME, AFL-CIO v State of New York, 229 AD2d 286, 290 [1997], lv denied 90 NY2d 807 [1997]).
Respondent's assertion that petitioners failed to exhaust their administrative remedies by seeking a waiver under the December 2016 order is unavailing. The petition challenges respondent's authority to impose a moratorium and, if such authority exists, argues that respondent's exercise of it was irrational and unconstitutional. Under these circumstances, "a waiver application could not have addressed petitioner[s'] argument[s] and would have been futile" (Matter of Pascazi v New York State Bd. of Law Examiners, 151 AD3d 1324, 1325 [2017]; see Watergate II Apts. v Buffalo Sewer Auth., 46 NY2d 52, 57 [1978]).
Respondent lawfully exercised its rule-making power when enacting the December 2016 order. Whether agency rulemaking infringes upon the Legislature's policy-making powers is governed by the "four coalescing circumstances" set forth in Boreali v Axelrod (71 NY2d 1 [1987]): "whether (1) the regulatory agency balanced costs and benefits according to preexisting guidelines, or instead made value judgments entailing difficult and complex choices between broad policy goals to resolve social problems; (2) the agency merely filled in details of a broad policy or if it wrote on a clean slate, creating its own comprehensive set of rules without benefit of legislative guidance; (3) the [L]egislature had unsuccessfully attempted to enact laws pertaining to the issue; and (4) the agency used special technical expertise in the applicable field" (Garcia v New York City Dept. of Health & Mental Hygiene, 31 NY3d 601, 609 [2018] [internal quotation marks, brackets and citations omitted]; see Matter of NYC C.L.A.S.H., Inc. v New York State Off. of Parks, Recreation & Historic Preserv., 27 NY3d 174, 179-180 [2016]).
This Court recently observed that respondent had the statutory authority to require that, in all new and renewal contracts between an ESCO and a residential customer or small nonresidential customer, the ESCO must guarantee "savings in comparison to what the customer would have paid as a full service utility customer or provide at least 30% renewable electricity" (Matter of Retail Energy Supply Assn. v Public Serv. Commn. of the State of N.Y., 152 AD3d at 1134 [internal quotation marks omitted]). Citing respondent's "broad" statutory authority "to set just and reasonable tariff rates for gas and electric corporations pursuant to Public Service Law articles 1 and 4" and that the same discretion allowed respondent to open the state's energy markets to ESCOs in the first instance, we observed that respondent may "impose limitations on ESCO rates as a condition to continued access" (id. at 1138-1139). The moratorium at issue on this appeal is directly responsive to concerns that ESCOs were costing customers, particularly APPs, more money than if they had just used a utility, a result in direct conflict with the original purpose of opening the energy markets to ESCOs (see id. at 1139). Because respondent's order involved a cost and benefits analysis grounded in preexisting policy objectives and merely filled in details of a broader policy — namely, ensuring that the competition created by ESCOs in the state's energy market reduced energy prices — the first two Boreali factors favor upholding the order. Regarding the third Boreali factor, petitioners failed to provide any pertinent examples of the Legislature attempting to redress the increase in energy service prices facilitated by ESCOs. Lastly, inasmuch as utility rate setting requires special technical expertise (see Matter of New York Tel. Co. v Public Serv. Commn. of State of N.Y., 95 NY2d 40, 48 [2000]; Matter of Home Depot U.S.A., Inc. v State of N.Y. Pub. Serv. Commn., 92 AD3d 1012, 1014 [2012], lv denied 19 NY3d 811 [2012]), the final factor also weighs heavily in respondent's favor. Accordingly, because all four Boreali factors support respondent's position, the order was enacted through lawful rulemaking.
Respondent complied with the State Administrative Procedure Act and procedural due process when enacting the December 2016 order. The record demonstrates that respondent duly published a notice of proposed rulemaking and provided at least 45 days for comment before the December 2016 order was adopted (see State Administrative Procedure Act 202 [former (1) (a) (i)]). Petitioners assert that respondent violated the law by not holding a public hearing, but they fail to identify any applicable statutory mandate requiring a hearing for the rulemaking in question (see Matter of Interstate Indus. Corp. v Murphy, 1 AD3d 751, 753 [2003]). Similarly, petitioners' assertion that they were entitled to a hearing under principles of procedural due process is unavailing because neither the US Constitution nor the NY Constitution requires a hearing before the adoption of administrative rules of general applicability by an agency with rule-making authority (see Matter of GASDA, Ltd. v Adducci, 179 AD2d 173, 176 [1992]; Matter of Kupferman v New York State Bd. of Social Welfare, 60 AD2d 674, 674 [1977], affd 47 NY2d 738 [1979]).
Respondent's enactment of the December 2016 order was not arbitrary or capricious. When reviewing an agency's exercise of its rule-making authority, this Court must determine whether the challenged action lacked a rational basis, such that it was arbitrary or capricious (see New York Assn of Counties v Axelrod, 78 NY2d 158, 166 [1991]; Matter of Hudson River Fisherman's Assn. v Williams, 139 AD2d 234, 238 [1988]; see also Matter of City of New York [*3]v New York State Pub. Serv. Commn., 105 AD3d 1200, 1203 [2013]). Here, the record contains data demonstrating that ESCOs were generally charging APPs more for gas and electricity than they would have been charged by utilities. Moreover, respondent produced an affidavit by its chief of the retail access and economic development section of the Office of Consumer Services, who explained that this data showed, in the 30 months from January 2014 to June 2016, that APPs statewide paid nearly $96 million more by purchasing energy products through ESCOs than if they had purchased those products from utilities. Comments submitted by NEM pursuant to the October 2016 notice of proposed rulemaking, and supported by the remaining petitioners, specifically addressed the data that petitioners now argue was not part of the administrative record.[FN1]
It was reasonable for respondent to rely on that data, which provided timely evidence of the price gap between ESCOs and utilities that had been identified by respondent since at least 2014. Specifically, in February 2014, respondent had issued an order concluding, in relevant part, that APPs were more likely to obtain their energy products from ESCOs than customers who do not receive low-income assistance and that ESCO customers in general were charged more than utility company customers for energy, without measurable energy-related value-added services. Likewise, the November 2015 collaborative report, which resulted from a months-long collaborative process involving all stakeholders, identified pricing concerns as well. The report concluded "that few, if any, ESCOs intend to offer a product which guarantees that the customer will pay no more than would have been paid had energy been purchased from the utility." Regarding energy-related value-added services or products, the report concluded that, although there were certain products offered by some ESCOs that potentially could save APPs money without diluting the effectiveness of their financial assistance, proposals about how ESCOs could offer fixed prices without ultimately overcharging APPs raised "complex" questions requiring additional research. Comments received during the comment period indicated that some of the energy-related services that ESCOs offered would be of little practical value to APPs because those services could be obtained by low-income individuals from government agencies for free or at a discount.
The data provided to respondent before the December 2016 decision confirmed and quantified a well-understood problem that had been adduced at the collaborative and referenced in prior orders. Although comments submitted by NEM in response to the October 2016 notice of rulemaking claimed that the data could not be properly scrutinized by ESCOs, petitioners offered no specific evidence that the data was unreliable despite having access to it, or evidence to contradict the previous opinions of respondent or participants of the collaborative. Indeed, the data was originally collected by utilities pursuant to a statute that required the same data to be used to calculate arrears owed by customers seeking to restore their previously terminated ESCO services (see Public Service Law § 32 [5] [d]; 16 NYCRR 11.9 [c] [6]). Considering this backdrop and according respondent due deference to resolve this highly technical issue related directly to utility rates (see Matter of New York Tel. Co. v Public Serv. Commn. of State of N.Y., 95 NY2d at 48; Matter of Home Depot U.S.A., Inc. v State of N.Y. Pub. Serv. Commn., 92 AD3d at 1014), reliance on the data in question was not irrational. Furthermore, the December 2016 order directly addressed the problems identified by respondent inasmuch as it required ESCOs to guarantee that their energy products offered to APPs would not cost more than buying energy from the local utility. Thus, the order was not irrational, arbitrary or capricious.
Supreme Court properly rejected petitioners' Contract Clause argument. "In evaluating a claim of contract impairment, the Supreme Court [of the United States] has adopted a three-prong test," with the first prong requiring consideration of whether the complaining party "has shown a substantial impairment of a contractual relationship" (Linton v Commissioner of Health & Environment, 65 F3d 508, 517 [6th Cir 1995] [internal quotation marks and citation omitted], [*4]cert denied 517 US 1155 [1996]; see Energy Reserves Group, Inc. v Kansas Power & Light Co., 459 US 400, 411-412 [1983]; see also US Const, art I, § 10, cl 1). The December 2016 order is carefully tailored to avoid interference with existing contracts between ESCOs and their customers. The order directs ESCOs to "de-enroll the identified accounts at the expiration of the existing agreement." Regarding APPs with month-to-month contracts, the order clarified that "the expiration of the agreement is at the end of the current billing period." The order required that any agreements including a "gift term" — where the customer receives a gift or period of free service after remaining with the ESCO for a designated period — be deemed to expire only after the end of the gift term. No ESCO had a contractual right to renewal of any particular contract once it expired. Accordingly, because the order did not affect existing contracts, the Contract Clause was not violated. To the extent that petitioners' argument based on General Business Law § 349-d is properly before us, it similarly must fail because the December 2016 order does not change the terms of any existing contract.
The December 2016 order does not violate the Equal Protection Clause because it is rationally related to legitimate government interests. Initially, because the order creates "a direct economic injury through the constriction of [ESCOs']
. . . market," petitioners have standing to raise an equal protection challenge for the benefit of APPs (Craig v Boren, 429 US 190, 194 [1976]; accord Epona, LLC v County of Ventura, 876 F3d 1214, 1220 [9th Cir 2017]). Indeed, "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function" (Craig v Boren, 429 US at 195; accord Epona, LLC v County of Ventura, 876 F3d at 1219). Under a rational basis analysis, the order is valid as long as any classifications it creates between similarly-situated individuals are "rationally related to a legitimate government interest" (Matter of Walton v New York State Dept. of Correctional Servs., 13 NY3d 475, 492 [2009]). Assuming, without deciding, that APPs are similarly-situated to other customers and utilities are similarly-situated to ESCOs, respondent had legitimate interests in protecting low-income consumers and preventing the waste of government- and ratepayer-subsidized funds (see Association of Residential Resources in Minn, Inc. v Gomez, 51 F3d 137, 141 [8th Cir 1995]; Tenoco Oil Co., Inc. v Department of Consumer Affairs, 876 F2d 1013, 1022 [1st Cir 1989]; see also 44 Liquormart, Inc. v Rhode Island, 517 US 484, 502 [1996]). Additionally, for the reasons discussed above, the order is rationally related to well-documented concerns that APPs are disproportionately exposed to higher prices at the hands of ESCOs. Accordingly, petitioners' equal protection argument must fail.
Finally, petitioners challenge the December 2016 order on the basis that it violates APPs' privacy rights by requiring utilities to inform ESCOs of which customers are enrolled in low-income assistance programs. Because petitioners have not shown that they will suffer any injury-in-fact by the ESCOs' receipt of such information, they lack standing to raise this challenge (see generally Society of Plastics Indus. v County of Suffolk, 77 NY2d 761, 773 [1991]).
Devine, Aarons, Rumsey and Pritzker, JJ., concur.
ORDERED that the judgment is affirmed, without costs.



Footnotes

Footnote 1: Despite petitioners' assertion that they needed supporting data to verify the information and calculations that respondent relied upon, parties have no right to discovery in administrative proceedings (see Matter of Miller v Schwartz, 72 NY2d 869, 870 [1988]).