Matter of Corning Natural Gas Corp. v Public Serv. Commn. of the State of N.Y. (2023 NY Slip Op 05559)

Matter of Corning Natural Gas Corp. v Public Serv. Commn. of the State of N.Y.

2023 NY Slip Op 05559

Decided on November 2, 2023

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:November 2, 2023

534175
[*1]In the Matter of Corning Natural Gas Corp., Petitioner,
v
Public Service Commission of the State of New York, Respondent.

Calendar Date:September 7, 2023

Before:Garry, P.J., Lynch, Pritzker, Reynolds Fitzgerald and Powers, JJ.

Nixon Peabody LLP, Rochester (Stanley W. Widger Jr. of counsel), for petitioner.
Robert Rosenthal, Public Service Commission, Albany (Timothy E. Pavelka of counsel), for respondent.

Pritzker, J.
Proceeding pursuant to CPLR article 78 (transferred to this Court by order of the Supreme Court, entered in Albany County) to review a determination of respondent establishing petitioner's rate for gas service.
Petitioner is a natural gas utility corporation regulated by respondent (see Public Service Law §§ 4, 5). In 2016, petitioner filed a petition with respondent seeking to defer, for later recovery, costs incurred by petitioner in 2015 for a leak survey and repair performed that were above previously established rates (hereinafter referred to as the deferral petition). Thereafter, in February 2020, petitioner separately filed with respondent revised tariff leaves with an effective date of April 1, 2020 (hereinafter referred to as the rate filing), including supporting documentation consisting of prepared testimony and exhibits. Therein, petitioner proposed a three-year rate plan. Under said plan, for the initial rate year (the 12-month period ending in January 2022), there would be a rate increase of $6,255,926, and for the two succeeding rate years (consisting of the 12-month periods ending in January 2023 and January 2024), there would be rate increases of $845,142 and $680,913, respectively.[FN1] To lessen the consumer impact, petitioner proposed levelized increases over the three-year period resulting in a $3,523,167 increase per year, amounting to a 10.93% yearly increase. Reflected in these proposed new rates is a 3% annual wage increase for all employees, the hiring of seven new employees, a seven-year amortization period for depreciation expenses associated with a leak-prone pipe, and a three-year amortization period for regulatory liabilities (amounts owed to consumers) and regulatory assets (amounts owed to petitioner), among other things. The rate filing further proposed that the relief requested in the deferral petition be granted in order to permit petitioner to recover costs incurred with repairs to a pipe in 2015 as a result of extreme winter conditions; specifically, a rate increase totaling $349,547 amortized over the three-year rate period.[FN2] Two Administrative Law Judges were appointed to preside over the administrative proceeding and, in April 2020, procedural and technical conferences were held and a ruling was subsequently issued establishing a schedule for the submission of filing updates, evidence and testimony. Subsequently, in May 2020, petitioner updated its filings to address the impact of the COVID-19 pandemic. Although the rate plan slightly decreased, petitioner was still seeking a revenue increase of over $6.22 million.
One month later, the staff of the Department of Public Service (hereinafter DPS) responded to petitioner's rate filing, offering a counter-proposal. This was supported by direct testimony and exhibits indicating that the impacts of the COVID-19 pandemic had been considered in crafting the counter-proposal. It was also recommended that petitioner's deferral petition be denied upon the basis that the [*2]costs related to the 2015 repair were not "extraordinary in nature." Petitioner thereafter filed a rebuttal. Subsequent attempts to engage in settlement negotiations were unsuccessful and the matter proceeded to an evidentiary hearing, held in March 2021. Following the evidentiary hearing, petitioner submitted an initial brief, reiterating its requests and related arguments, including those concerning the impact of the COVID-19 pandemic. DPS also filed an initial brief, modifying its original counter-proposal to reflect the suggested imposition of austerity measures based upon a greater understanding of the financial impact of the COVID-19 pandemic and arguing for the denial of petitioner's deferral petition. Petitioner thereafter submitted a reply brief, in which it addressed DPS's "austerity" adjustments and argued against the denial of its deferral petition. Petitioner subsequently attempted to submit additional filings, most of which were not considered by respondent as being unauthorized surreplies.
Respondent thereafter issued an order establishing rates and a rate plan for petitioner, allowing an overall revenue increase of 1.77% over the 12-month period between February 1, 2021 and January 31, 2022 (hereinafter referred to as the rate year). In mitigating the economic impact on ratepayers, respondent adopted some of DPS's suggested COVID-19 austerity adjustments: (1) removing the allowance for nonunion wage increases for the rate year; (2) removing the allowance for certain proposed new employees for the rate year; (3) removing the accelerated amortization of leak-prone pipes; and (4) adjusting the amortization of regulatory assets and liabilities. Respondent also denied the deferral petition. Petitioner commenced this CPLR article 78 proceeding to review each of these aspects of respondent's determination.
Contrary to petitioner's contention, respondent's order establishing rates and a rate plan for the rate year is supported by substantial evidence. Initially, respondent "may not deny a utility a reasonable rate of return on its investment" (Matter of Crescent Estates Water Co. v Public Serv. Commn. of State of N.Y., 77 NY2d 611, 620 [1991]; accord Matter of Home Depot U.S.A., Inc. v State of N.Y. Pub. Serv. Commn., 92 AD3d 1012, 1014 [3d Dept 2012], lv denied 19 NY3d 811 [2012]). However, within this context, "[respondent's] determinations in setting just and reasonable rates are entitled to deference and may not be set aside unless they are without rational basis or without reasonable support in the record" (Matter of New York Tel. Co. v Public Serv. Commn. of State of N.Y., 95 NY2d 40, 48 [2000] [internal quotation marks and citation omitted]; see Matter of Home Depot U.S.A., Inc. v State of N.Y. Pub. Serv. Commn., 92 AD3d at 1014). "Judicial deference is warranted because setting utility rates presents problems of a highly technical nature, the solutions to which in general have been left by the Legislature to the expertise of the [*3]Public Service Commission" and, as such, "the courts have not insisted upon a rigid approach" (Matter of New York Tel. Co. v Public Serv. Commn. of State of N.Y., 95 NY2d at 48-49 [internal quotation marks, brackets, ellipsis and citations omitted]). "To the contrary, '[respondent] is free to entertain or ignore any particular factor, or to assign whatever weight it deems appropriate' " (Matter of New York Tel. Co. v Public Serv. Commn. of State of N.Y., 95 NY2d at 49, quoting Matter of Abrams v Public Serv. Commn. of State of N.Y., 67 NY2d 205, 212 [1986]). "In determining whether a utility has set reasonable rates, [this Court has] held that [respondent] must evaluate the economic consequences of a utility's actions" to ensure the protection of ratepayers (Matter of Rochester Tel. Corp. v Public Serv. Commn. of State of N.Y., 87 NY2d 17, 29 [1995]; see Matter of Niagara Mohawk Power Corp. v Public Serv. Commn. of State of N.Y., 69 NY2d 365, 369 [1987]). Inasmuch as respondent's determination was made following an evidentiary hearing, it will not be disturbed as long as it is supported by substantial evidence (see CPLR 7803 [4]; Matter of National Fuel Gas Distrib. Corp. v Public Serv. Commn. of the State of N.Y., 169 AD3d 1334, 1334-1335 [3d Dept 2019], lv denied 33 NY3d 1053 [2019]; compare Matter of City of New York v New York State Pub. Serv. Commn., 105 AD3d 1200, 1202 [3d Dept 2013]).
Here, the record reflects that DPS's initial recommendation disagreeing with the requests detailed in petitioner's rate filing was based, at least in part, upon "much economic uncertainty due to the COVID-19 pandemic" at that time. With the passage of time, owing in part to failed negotiation efforts, the unprecedented scale of the pandemic's impact upon consumers' financial security was revealed and, accordingly, DPS modified its earlier proposal. In this regard, in its initial posthearing brief, DPS recommended the imposition of certain austerity measures during the rate year based upon the financial impact of the COVID-19 pandemic. These measures included, in relevant part, a 0% wage increase in the rate year for nonunion employees (a reduction of the revenue requirement by $5,139), the removal of the allowance for certain new employees in the rate year (a reduction of the revenue requirement by $344,513), the elimination of the accelerated amortization of leak-prone pipes (a reduction of the revenue requirement by roughly $439,206), and a further reduction of the revenue requirement by $269,972 to reflect an amortization of all regulatory assets over 10 years or, in the alternative, denial of amortization of regulatory assets in the rate year, coupled with amortization of regulatory liabilities over either five or three years (a reduction of the revenue requirement by $631,884 or $728,348, respectively). In support of its recommendation, DPS noted that, even after petitioner purportedly updated its rate filing to reflect the ongoing pandemic, it nevertheless [*4]sought a similar and substantial revenue requirement increase of over $6.22 million — a revenue increase of nearly 23%. DPS described such a significant revenue requirement increase as "almost unheard of, whether they are filed during periods of economic prosperity, much less [in] times such as [the pandemic], where individuals, businesses and long-standing institutions are grappling with economic and social struggles and problems directly resulting from the [p]andemic and the efforts to confront it." DPS contended that petitioner's proposed rate year revenue requirement increase was "ill-conceived in light of the tremendous revenue and rate impacts during this [p]andemic, which is unprecedented." In balancing petitioner's interests with consumers' needs for affordable energy and heating, especially during such a tumultuous period, DPS recommended that respondent consider denying petitioner's rate filing proposal and instead adopt DPS's proposed COVID-19 austerity measures. As further evidence in support of the proposed austerity measures, in its initial brief, respondent referenced an executive order issued by the Governor in response to the COVID-19 pandemic declaring a disaster emergency during the relevant time period (see Executive Order [A. Cuomo] No. 202 [9 NYCRR 8.202]). The Legislature, in turn, amended the Public Service Law to prevent any utility from terminating or disconnecting service for nonpayment for the duration of the state of emergency (see Public Service Law § 32 [7], as amended by L 2020, ch 108).
Petitioner, in addressing the impact of the COVID-19 pandemic in its prehearing update to its rate filing, relied upon the testimony of its chief financial officer, Firouzeh Sarhangi. Sarhangi testified regarding the impact that the COVID-19 pandemic would have on petitioner's operations. Specifically, he expected that petitioner would experience a "loss of gas load" and "significantly lower revenues primarily from the commercial and industrial sectors" and increased "arrears and uncollectible accounts" due to rising unemployment. According to Sarhangi, these issues would "adversely impact [petitioner's] ability to raise capital on favorable terms." Notably, Sarhangi acknowledged that petitioner had received $970,900 in federal pandemic assistance. Operationally, Sarhangi expected difficulties related to the reading of meters located within customers' homes, limited customer service interaction, and adverse impacts on maintenance and construction activities. Notably, petitioner's customer service manager, Charlene M. Faulk, testified that the full effects of the pandemic were not yet known at that time, but that balances and uncollectible expenses were expected for some customers, especially given the moratorium on disconnecting service due to nonpayment. Petitioner's vice president of operations and customer service, Matt J. Cook, also testified regarding some adjustments that had been made to petitioner's proposal, including the [*5]delay of certain construction projects and the purchase of certain vehicles. In its initial posthearing brief, petitioner again addressed the impact of the pandemic upon its rate proposal, highlighting the temporary nature of the pandemic and the "inequity" of pushing pandemic-related costs on to future consumers in arguing that its rate filing proposal was necessary to meet its operational needs. In its posthearing reply brief, petitioner further argued that DPS's recommended austerity measures to address the financial impact of the COVID-19 pandemic are factually unsupported.
Respondent's order establishing rates and a rate plan for petitioner allowed an overall revenue increase of 1.77% over the rate year. In mitigating the economic impact on ratepayers, respondent adopted some of DPS's suggested COVID-19 adjustments: specifically, removing the allowance for nonunion wage increases for the rate year and certain proposed new employees, removing the accelerated amortization of leak-prone pipes and adjusting the amortization of regulatory assets and liabilities. Based upon respondent's unchallenged calculations, these measures would reduce petitioner's revenue. However, owing to other financial factors, ultimately, the full impact of these measures would result in petitioner having an annual revenue increase of $505,000 and a 6.28% overall rate of return. At the same time, these measures would also result in a small 2.43% increase to residential customers during the rate year, with low-income customers seeing a decrease in costs of roughly 6.14%. In reaching its determination, respondent stated that it could not "ignore the . . . economic hardships caused by the COVID-19 pandemic," as a failure to do so "would, in effect, impose additional hardships on ratepayers at a time of unusual and unexpected need." Respondent found that an argument made by petitioner that recent events had demonstrated improving nature of the pandemic "is not a rational basis for ignoring what actually happened in the recent past." Respondent thus reasoned that the imposition of DPS's austerity measures to mitigate the increase in petitioner's revenue requirement over the rate year would serve to "protect the interests of ratepayers in the context of the [then]-ongoing COVID-19 pandemic." Respondent further held that the need to employ such measures "far outweigh[ed] [petitioner's] need to increase management salaries and add [certain] new positions" during that 12-month period. Respondent noted, however, that the measures imposed would have only "a one-year duration."
Although we do, to an extent, agree with petitioner that respondent could have made a stronger evidentiary showing in support of its requested austerity adjustments, we must bear in mind not only the deference afforded to respondent (Matter of New York Tel. Co. v Public Serv. Commn. of State of N.Y., 95 NY2d at 48-49), but also that substantial evidence "is a minimal standard that requires less than proof by [*6]a preponderance of the evidence, and demands only that a given inference is reasonable and plausible, not necessarily the most probable" (Matter of National Fuel Gas Distrib. Corp. v Public Serv. Commn. of the State of N.Y., 169 AD3d at 1335 [internal quotation marks and citations omitted]). Indeed, the unprecedented and adverse impacts of the COVID-19 pandemic on consumers and utilities are undisputed. DPS, through its filings, emphasized the unprecedented scale and impact of the COVID-19 pandemic upon the financial health of consumers, necessarily implicating their ability to afford basic utilities. Petitioner did not refute this and, in fact, based its request for a significant increase in its revenue requirement upon its acknowledgment that some customers would likely be unable to pay their utility bills. Notwithstanding these dire circumstances, respondent crafted its rate plan for the rate year in a way that both avoided denying petitioner "a reasonable rate of return on its investment" (Matter of Home Depot U.S.A., Inc. v State of N.Y. Pub. Serv. Commn., 92 AD3d at 1014 [internal quotation marks and citation omitted]) while protecting consumers' access to affordable heating and energy. Although denying petitioner's request for a significant revenue requirement increase necessarily involved the denial of certain aspects forming the basis of that request — i.e., nonunion employee wage increases, new hiring, amortization of leak-prone pipes and regulatory liabilities and assets — petitioner was ultimately afforded, based upon the unchallenged calculation of various factors, an increase in revenue for the rate year. Consumers, in turn, were asked to pay only slightly higher rates, to avoid burdening them with further financial hardship during the pandemic. Moreover, the challenged austerity measures were imposed for one year only, with the hope and expectation that the circumstances created by the pandemic would improve.[FN3] In view of the foregoing, substantial evidence supports that part of respondent's order imposing COVID-19-related austerity measures disallowing wage increases to nonunion workers, removing the allowance for certain new employees, removing the accelerated amortization for leak-prone pipes and modifying the amortization periods for regulatory assets and liabilities (see CPLR 7803 [4]; Matter of National Fuel Gas Distrib. Corp. v Public Serv. Commn. of the State of N.Y., 169 AD3d at 1337-1338; see generally Matter of Rochester Tel. Corp. v Public Serv. Commn. of State of N.Y., 87 NY2d at 29; Matter of Cohalan v Gioia, 88 AD2d 722, 724 [3d Dept 1982]).
To the extent that petitioner challenges the specific rates and rate plan established under respondent's order, contrary to petitioner's arguments, it is of no import that the order is more stringent than the recommendations made by DPS as respondent was not limited or constrained by the parties' respective positions (see Matter of Kessel v Public Serv. Commn. of State of N.Y., 136 [*7]AD2d 86, 100 [3d Dept 1988], lv denied 72 NY2d 805 [1988]; Matter of ADT Co. v Public Serv. Commn. of State of N.Y., 128 AD2d 1, 5 [3d Dept 1987]). In exercising its broad authority to regulate utility rates (see Public Service Law §§ 65, 66; Matter of Niagara Mohawk Power Corp. v Public Serv. Commn. of State of N.Y., 69 NY2d at 369, 372; Matter of Incorporated Vil. of Freeport v Public Serv. Commn. of the State of N.Y., 206 AD3d 1205, 1207-1208 [3d Dept 2022]; Matter of New York State Elec. & Gas Corp. v Public Serv. Commn. of State of N.Y., 308 AD2d 108, 111 [3d Dept 2003]), respondent's order is "just and reasonable" (Public Service Law § 72) as "the rate-setting process [here] results in a rate tariff reflecting a just and reasonable balancing of consumer and investor interests, the legislative intent, as well as constitutional and decisional mandates" (Matter of Niagara Mohawk Power Corp. v Public Serv. Commn. of State of N.Y., 69 NY2d at 372 [internal quotation marks and citation omitted and emphasis added]; see Matter of Emerald Green Lake Louise Marie Water Co., Inc. v Public Serv. Commn. of the State of N.Y., 207 AD3d 923, 924 [3d Dept 2022]). Significantly, when setting rates, it is within respondent's authority to take into account the economic fallout from an event such as the pandemic or other economic or public health challenge (see generally Matter of Cohalan v Gioia, 88 AD2d at 724).[FN4]
Respondent's order denying petitioner's deferral petition is also supported by substantial evidence, despite petitioner's assertion that respondent erred in finding that petitioner's 2015 expenditures related to a leak survey and repair were not "extraordinary in nature." In considering the deferral petition, the parties agree that respondent applied the appropriate three-prong test, requiring that expenses (1) are incremental to the amount allowed in rates, (2) are material and extraordinary in nature, and (3) that a utility is not earning in excess of its allowed return (see Petition of Emerald Green Lake Louise Marie Water Company, Inc. for Approval to Defer and Surcharge its Customers to Recover Extraordinary Emergency Repairs, NY PSC Case No. 19-W-0783, 3 n 9 [Aug. 19, 2020]; Proceeding on Motion of respondent as to the Rates, Charges, Rules and Regulations of Niagara Mohawk Power Corporation d/b/a National Grid for Gas Service, NY PSC Case No. 17-G-0239, 22 [Nov. 20, 2020]). In seeking recovery of leak and repair costs incurred in 2015, petitioner submitted data demonstrating that in 2015 it had discovered nearly twice the number of leaks and had repaired roughly 55% more leaks as compared to the three preceding years. In further explanation, petitioner proffered the testimony of its chief financial officer and treasurer, Charles Lenns, that its service area had experienced "severe frost conditions" during the relevant time period as a result of low snow coverage and that these "localized conditions" made the survey and repair actions taken necessary [*8]and "prudent." When comparing its actions with other utilities in the state during the same winter, Lenns noted that there is only one other gas utility in its service area and that this utility "has only a small service territory." In contrast, DPS submissions reflected that the winter of 2015 had been only 1.7% colder than the previous winter and that no other gas utility undertook a similar survey of its entire system in 2015.
In denying the relief requested in petitioner's deferral petition, respondent relied upon DPS's submissions and reasoned that, contrary to petitioner's contentions, "[e]very winter has periods of time that are significantly colder than average," but that "[t]he appropriate period of time for determining whether cold weather is extraordinary is the entire winter, not the period of a particular cold temperature event." More to the point, respondent found that the winter of 2015 had not been "materially colder" than the previous winter, noting that "it is a common occurrence" that some days in January and February will be significantly colder in any winter. Respondent found it telling that "other gas utilities did not undertake a similar systemwide survey and repair program during the winter in question." In view of the foregoing, a rational basis supports respondent's finding that petitioner's costs incurred in 2015 for a leak survey and related repairs were not extraordinary in nature and, thus, not eligible for deferral treatment (see Matter of National Fuel Gas Distrib. Corp. v Public Serv. Commn. of the State of N.Y., 169 AD3d at 1335; compare Petition of Emerald Green Lake Louise Marie Water Company, Inc. for Approval to Defer and Surcharge its Customers to Recover Extraordinary Emergency Repairs, Case No. 19-W-0783, 5-6 [Aug. 19, 2020]).
Contrary to petitioner's further contention, that portion of respondent's rate order providing for a 3% wage increase only for union employees does not violate the Equal Protection Clause inasmuch as it is "rationally related to [a] legitimate government interest[ ]" (Matter of National Energy Marketers Assn. v New York State Public Serv. Commn., 167 AD3d 88, 98 [3d Dept 2018]). "An agency of the State denies equal protection when it treats persons similarly situated differently under the law[, and] . . . [c]ontroversies involving compensation are . . . subject to review under the guarantees of equal protection" (Matter of Abrams v Bronstein, 33 NY2d 488, 492 [1974]). An equal protection challenge based upon economic classification "must be judged under a rational basis standard" (Abberbock v County of Nassau, 213 AD2d 691, 691 [2d Dept 1995] [internal quotation marks omitted], lv denied 86 NY2d 708 [1995]; see Henry v Milonas, 91 NY2d 264, 268 [1998]; Schneider v Sobol, 76 NY2d 309, 314-315 [1990]). "Under a rational basis analysis, the order is valid as long as any classifications it creates between similarly-situated individuals are 'rationally related to a legitimate government [*9]interest' " (Matter of National Energy Marketers Assn. v New York State Public Serv. Commn., 167 AD3d at 99, quoting Matter of Walton v New York State Dept. of Correctional Servs., 13 NY3d 475, 492 [2009]). "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality" (Matter of Jones v Blum, 101 AD2d 330, 334 [3d Dept 1984] [internal quotation marks and citations omitted], affd 64 NY2d 918 [1985]).
Here, in declining to provide a wage increase to nonunion employees only, respondent's order explicitly stated that "the need to employ austerity measures far outweighs [petitioner's] need to increase management salaries," however, given evidence that a collective bargaining agreement (hereinafter CBA) had been reached and ratified with respect to union employees, "[i]t is standard Commission practice to recognize completed [CBAs]." Given the unprecedented financial scale and impact of the COVID-19 pandemic, respondent's denial of an allowance to increase wages for nonunion employees for the rate year served a legitimate government purpose in exercising its role to safeguard affordable energy for consumers during a tumultuous time (see Public Service Law §§ 65, 66, 72). This austerity measure directly impacted ratepayers by lowering petitioner's revenue requirement, thus, the lower energy prices were passed on to consumers. Accordingly, the equal protection rights of nonunion employees were not violated (see Benjamin v Town of Fenton, 892 F Supp 64, 68 [ND NY, 1995]; Abberbock v County of Nassau, 213 AD2d at 692; see generally Matter of National Energy Marketers Assn. v New York State Pub. Serv. Commn., 167 AD3d at 98-99).[FN5] Further, respondent's order was limited to the 12-month rate year and only restricted petitioner from passing costs associated with increasing wages for nonunion workers on to consumers, but did not prohibit petitioner from increasing said wages by some other means.[FN6] Accordingly, although there is undoubtedly some inequity created by this particular austerity measure, the temporary nature of the restriction in light of the unprecedented circumstances of the pandemic are not likely to restrain or coerce an employee in his or her choice to engage in or refrain from collective bargaining so as to violate the National Labor Relations Act (see 29 USC §§ 157, 158 [b] [1] [A]). We have reviewed petitioner's remaining contentions and find them to be without merit.
Garry, P.J., Lynch, Reynolds Fitzgerald and Powers, JJ., concur.
ADJUDGED that the determination is confirmed, without costs, and petition dismissed.

Footnotes

Footnote 1: As background, a rate year is the 12-month future period for which respondent sets rates for a regulated utility based upon past data preceding the utility's rate filing, which is then adjusted for known and projected changes.

Footnote 2: Leak-prone pipes are bare and coated/unprotected steel pipes that petitioner was required to replace over the course of several years as part of respondent's replacement plan.

Footnote 3: Respondent notes in its brief on appeal that a subsequent three-year rate order was reached, following the rate year at issue, that included a 3% wage increase for all employees, the hiring of an accountant and a training technician, a five-year amortization period for all regulatory deferrals, a revenue increase of more than $2.5 million and an overall return rate of 6.53%.

Footnote 4: Petitioner's procedural argument that it was not afforded an opportunity to address the basis of DPS's COVID-19-based recommendations is belied by the record, which reflects that petitioner squarely addressed the issue of the impact of the COVID-19 pandemic upon its rate filing at multiple intervals throughout the administrative proceeding, including following the evidentiary hearing.

Footnote 5: In support of its equal protection argument, petitioner relies heavily on Rochester Gas & Elec. Corp. v Public Serv. Commn. (64 AD2d 345 [3d Dept 1978], affd 51 NY2d 823 [1980], appeal dismissed 450 US 961 [1981]). We find that reliance misplaced. In that case, this Court was not tasked with determining whether the petitioner's equal protection rights were violated. Rather, the issue was whether respondent limiting a future wage increase to 6% because it was not subject to collective bargaining was supported by a rational basis, as well as whether respondent's refusal to conduct a hearing on the issue was arbitrary and capricious (id. at 349-350).

Footnote 6: For example, the record demonstrates that the CBA provides for a rate increase of 3.5% for union employees. However, petitioner only requested a 3% wage increase for all employees. This leads to the conclusion that the remaining .5% wage increase for union employees would be borne by petitioner in a different manner so as to avoid violating the CBA.